Qwest Communications Company, LLC,

                     Plaintiff,

v.

Free Conferencing Corp.; Audiocom, LLC;
Global Conference Partners; Basement
Ventures, LLC; Vast Communications,
LLC; Ripple Communications, Inc.,

                     Defendants.

**Civil File No: 10-cv-490 MJD/SER**

**REPORT AND RECOMMENDATION**

John T. Osgood, Sandra L. Potter, and Charles W. Steese, Esqs., Steese, Evans & Frankel, PC, 6400 South Fiddlers Green Circle, Suite 1820, Denver, Colorado 80111, for Plaintiff.

Jason D. Topp, Esq., CenturyLink, 200 South 5th Street, Suite 2200, Minneapolis, Minnesota 55402, for Plaintiff.

Daniel J. Herber and Jonathan W. Dettmann, Esqs., Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant Free Conferencing Corp.

Larry D. Espel, Esq., Green Espel PLLP, 222 South Ninth Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant Audiocom, LLC.

Gregory R. Merz, Esq., Gray Plant Mooty Mooty & Bennett, PA, 80 South Eighth Street, Suite 500, Minneapolis, Minnesota 55402, for Defendants Basement Ventures, LLC and Vast Communications, LLC.

Edward P. Gothard, Esq., Nowalsky, Bronston & Gothard, PLLP, 3500 North Causeway Boulevard, Suite 1442, Metairie, Louisiana 70002, for Defendant Ripple Communications, Inc.

Kelly K. Pierce, Esq., Ross & Orenstein LLC, 222 South Ninth Street, Suite 470, Minneapolis, Minnesota 55402, for Defendant Ripple Communications, Inc.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Free Conferencing Corporation's ("Free Conferencing") Motion to Dismiss First Amended Complaint ("Free Conferencing's Mot. to Dismiss") [Doc. No. 139], Defendant Audiocom LLC's ("Audiocom") Motion to Dismiss Amended Complaint ("Audiocom's Mot. to Dismiss") [Doc. No. 144], Defendants Vast Communications ("Vast") and Basement Ventures' (collectively, "Vast/Basement Ventures") Motion to Dismiss (Vast/Basement Ventures' Mot. to Dismiss") [Doc. No. 166], Defendant Global Conference Partners' ("GCP") Motion to Dismiss Qwest's First Amended Complaint ("GCP's Mot. to Dismiss") [Doc. No. 170], and Defendant Ripple Communications, Inc.'s ("Ripple") Motion to Dismiss Pursuant to Rule 12(b)(6) and 12(b)(1) ("Ripple's Mot. to Dismiss") [Doc. No. 176]. The Motions were referred to the undersigned for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1, and heard on June 27, 2013. (Order of Referral Dated April 19, 2013, "April 2013 Referral") [Doc. No. 156]; (Order of Referral Dated May 15, 2013, "May 2013 Referral") [Doc. No. 183]; (Minute Entry Dated June 27, 2013) [Doc. No. 235].[1]

GCP filed for bankruptcy the day after the Motions to Dismiss were heard. (Notice of Pendency of Global Conference Partners' Bankruptcy Proceeding & Automatic Stay) [Doc. No. 234]. Notwithstanding GCP's automatic bankruptcy stay, this case may still proceed against Audiocom, Basement Ventures, Free Conferencing, Ripple, and Vast. *See* 11 U.S.C. § 362(a), *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 789 (8th Cir. 2009) (stating that "stays pursuant

---

[1]     The Court also heard oral argument on Qwest's Motion for a Protective Order. (Qwest's Mot. for Protective Order to Govern Confidential Disc.) [Doc No. 191]; (Minute Entry Dated June 27, 2013). Since the hearing, the parties have resolved their dispute about the protective order. *See* (Stip. of the Parties on Qwest's Mot. (Dkt. 191) for Protective Order to Govern Confidential Disc.) [Doc. No. 240].

to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants") (quotations and citations omitted). Thus, although much of this R&R applies with equal force to GCP because it is in substantially the same position as the remaining Defendants (Audiocom, Free Conferencing, Basement Ventures, Vast, and Ripple, collectively "Defendants"), the R&R does not address GCP's Motion to Dismiss.

This case arises out of Plaintiff Qwest Communications Company LLC's ("Qwest") allegations that Defendants caused Tekstar Communications, Inc. ("Tekstar") to breach its tariffs, resulting in Qwest's payment to Tekstar of illegal charges. (First Am. Compl., "FAC") [Doc. No. 120 ¶ 3]. Tekstar and two Defendants, Audiocom and Free Conferencing, were named in the initial Complaint. (Compl.) [Doc. No. 1]. Tekstar has since been dismissed from this case, and Qwest filed an amended Complaint against Audiocom, Free Conferencing, Vast/Basement Ventures, GCP, and Ripple. (Order Dated Jan. 15, 2013, "Tekstar Dismissal Order") [Doc. No. 99]; (FAC).

For the reasons stated below, the Court recommends that Defendants' Motions to Dismiss be granted in part and denied in part.

I.    BACKGROUND

    A.    Factual Background[2]

        1.    Qwest

Qwest, a long-distance carrier ("LDC"), delivered long-distance calls to phone numbers assigned to Defendants, which are all free conferencing service companies ("FCSCs") using a

_____

[2]    On a motion to dismiss for failure to state a claim upon which relief can be granted, the facts in the complaint must be taken as true. *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 990 (8th Cir. 2007) (citation omitted). Although this R&R also addresses motions to dismiss for lack of subject-matter jurisdiction, the disputed factual allegations relevant to those motions concern only damages claimed and are described in more detail below.

local exchange carrier ("LEC"), Tekstar. (FAC ¶ 10). The origin of a call appears to dictate the method of delivery. For the purposes of this case, Qwest's calls are delivered in one of three ways. (*Id.* ¶ 80).[3] First, a Qwest long-distance customer may make a phone call to a phone number associated with one of the Defendants. (*Id.* ¶ 80.A). Qwest delivers the call directly to Tekstar, who then delivers the call to one of the Defendants' phone numbers. (*Id.*). Second, a customer of another LDC may make a call to one of the Defendants that the customer's LDC passes to Qwest. (*Id.* ¶ 80.B). Qwest then delivers the call to Tekstar, who is acting as a wholesale carrier and then delivers the call to one of the Defendant's phone numbers. (*Id.*). Finally, Qwest may deliver the call through what it calls "Least-Cost Routing." (*Id.* ¶ 80.C). This method involves Qwest first delivering a call from one of its customers to another LDC. (*Id.*).[4] The LDC then delivers the call to Tekstar for final delivery to one of the Defendant's phone numbers. (*Id.*). In this instance, the LDC provides wholesale delivery. (*Id.* ¶¶ 34, 80.C) This method is used when it is cheaper for Qwest to use another LDC as an intermediary than it would be for Qwest to deliver the call directly to Tekstar—hence the term Least-Cost Routing. (*Id.* ¶ 80.C.).

---

[3]     The First Amended Complaint states that the calls are delivered in "at least three different ways[,]" but only those methods described in paragraph 80 appear to be relevant to this case. (FAC ¶ 80).

[4]     Although the First Amended Complaint does not specify that this type of call originates with a Qwest customer, Qwest describes no other customer in this scenario, and the assumption makes sense in the context of the other delivery methods in the First Amended Complaint. *See* (FAC ¶ 80).

### 2.      Tekstar

Companies (LECs) like Tekstar typically service customers within a certificated local exchange area, also called a local calling area.[5]  (*Id.* ¶ 33).  LDCs deliver calls from one local calling area to another local calling area.  (*Id.*).  In contrast, LECs provide termination services, and are usually the exclusive providers of termination services to the end users in their calling area.  (*Id.* ¶¶ 33, 39).  LECs also own the wires and facilities used to terminate the call with the end user customer who receives that call.  (*Id.* ¶ 35).  This arrangement gives LECs, and specifically here, Tekstar, "monopoly control" over calls to Defendants' phone numbers such that Qwest and other LDCs have to deliver calls to Tekstar for final delivery to Defendants' phone numbers and other end users in Tekstar's local calling area.  (*Id.* ¶¶ 10, 39).

### 3.      FCC Regulation

Both Qwest and Tekstar are telecommunications companies, and are subject to strict regulation by the Federal Communications Commission (the "FCC") and the Minnesota Public Utilities Commission (the "MPUC").  (*Id.* ¶¶ 21, 36, 40–52).  Tekstar must file tariffs with the FCC and the MPUC; the tariffs are then used to charge Qwest.  (*Id.* ¶¶ 11, 49, 51).

For Tekstar to charge Qwest under its interstate access tariff filed with the FCC, the call must meet certain requirements described in the tariff.  (*Id.* ¶¶ 40, 41).  The call must be delivered to an end user, "who subscribes to an interstate telecommunications service from Tekstar's FCC tariff and is not a carrier[,]" and must terminate on the end user's premises.  (*Id.* ¶¶ 41–44).  Additionally, the call must traverse the "common line," meaning the end user purchased Tekstar's local exchange tariff and is "expected to pay mandatory charges set forth in

---

[5]      The Court will use the term "local calling area" for ease of reference throughout this R&R.

Tekstar's interstate tariff." (*Id.* ¶¶ 46–48). Tekstar's intrastate tariff has similar requirements to its interstate tariff: it defines the conditions under which Tekstar may assess switched access charges, requires calls to be delivered to an end user on that end user's premises, and requires that the calls traverse a common line and terminate in a local calling area. (*Id.* ¶¶ 51–52).

Under Tekstar's local exchange tariff, on file with the MPUC, Tekstar's customers are expected to pay for services that Tekstar bills them for on a monthly basis, including taxes and surcharges, and the local exchange tariff does not contain "SIP bindings" or "SIP connections" as a service. (*Id.* ¶¶ 49, 50).[6] This case focuses on Tekstar's charges, under its tariffs, to Qwest for calls Tekstar delivered to Defendants.[7] (*Id.* ¶ 3).

### 4. Defendants

Defendants used websites to advertise free conference calls or free calls to adult chat rooms, the operation of which required significant financial resources.[8] (*Id.* ¶¶ 8, 59, 74). Defendants' primary source of revenue was the switched access fees paid to Tekstar, which Tekstar then passed on to Defendants. (*Id.* ¶¶ 17, 75). Defendants' services are free to their customers, and Qwest alleges that Tekstar's relationship with Defendants subsidized the free services. (*Id.*). If not for LDCs like Qwest, Defendants would have to collect revenue from their customers. (*Id.* ¶¶ 75–77). Instead, Defendants received payments from Qwest through Tekstar and made millions of dollars offering free services. (*Id.* ¶ 77).

---

[6] The First Amended Complaint does not define "SIP bindings" or SIP "connections."
[7] Although the First Amended Complaint frequently refers to other FCSCs, this summary is confined to Defendants, the only FCSCs that are parties to this case.
[8] Even though paragraphs 8 and 74 refer to "Defendants," Qwest makes claims against only Audiocom and Ripple for providing adult content through their services. *See* (FAC ¶¶ 111–25).

### 5. Tekstar's Relationship with Defendants

Tekstar and Defendants' business relationships ostensibly formed so that Tekstar could provide Defendants with local telephone exchange provider services. (*Id.* ¶ 54). But Defendants did not obtain local exchange services or purchase local exchange services from Tekstar. (*Id.* ¶¶ 54, 65–67). Tekstar assigned phone numbers to Defendants and Defendants placed equipment in buildings controlled by Tekstar or a Tekstar affiliate, called a central office. (*Id.* ¶¶ 7, 56, 69). Defendants' phone numbers were associated with Tekstar's local calling areas, despite the fact that Defendants did not reside in Minnesota, much less in one of Tekstar's local calling areas. (*Id.* ¶¶ 7, 55, 58, 61, 63). The phone numbers Tekstar assigned to Defendants did not terminate to an end user's premises. (*Id.* ¶ 67). Some calls did not terminate in the applicable Tekstar local calling area. (*Id.* ¶ 68). When a customer called a Defendant's Tekstar-assigned phone number, the connection was made to that Defendant's equipment. (*Id.* ¶ 60). The connection to that specific Defendant's equipment permitted the customer to participate in conference calls, some of which Qwest alleges included adult content. (*Id.*). Despite the fact that Defendants and their employees do not reside in Minnesota, most or all of Defendants' equipment was located in Perham, Minnesota, which was not part of Tekstar's certificated service territory. (*Id.* ¶¶ 57, 61, 63). Tekstar gradually moved Defendants' equipment to locations where it was certificated. (*Id.* ¶ 57).

Qwest alleges that Defendants and Tekstar purposefully concealed their relationship, and that Tekstar gave Defendants "kickbacks" in the form of a portion of the fees it collected from Qwest and other LDCs to deliver calls to Defendants' phone numbers. (*Id.* ¶¶ 3, 12, 15, 53). The contracts between Tekstar and Defendants were not filed with the FCC or MPUC, were not posted on Tekstar's website, and were not otherwise available to the public. (*Id.* ¶¶ 64.H, 70–

72).  The relationships between Tekstar and Defendants were also designed to stimulate calls routed to Defendants through Tekstar, which Qwest describes as a "traffic-pumping scheme." (*Id.* ¶ 18, 53).  Tekstar billed Qwest and other LDCs as though the calls were routed through Perham prior to going through the local calling area.  (*Id.* ¶ 58).  In fact, that extra transport element did not take place.  (*Id.*).

Tekstar's relationships with Defendants were similar to partnerships, joint ventures, or business arrangements.  (*Id.* ¶ 64).  For example, Tekstar did not send invoices to Defendants until July 2009, and when it did, those charges were rebated to some degree.  (*Id.* ¶ 64.A).  Defendants did not pay charges under Tekstar's interstate tariff, and they did not pay taxes or mandatory surcharges for Tekstar's services.  (*Id.* ¶¶ 64.B, C).  Tekstar's local exchange tariffs did not include a category of customers like Defendants and did not define the relationships between Tekstar and Defendants.  (*Id.* ¶¶ 64.E, H).  Tekstar did not offer local service to Defendants under its local exchange tariffs.  (*Id.* ¶ 64.G).  Some of the individual contracts between Defendants and Tekstar had minimum volume commitments; different rates, terms, and conditions compared to Tekstar's contracts with other FCSCs; and provided for different payments to Defendants when access rates change.  (*Id.* ¶¶ 64.I, J, K, 73).  Until July 2009, Defendants did not pay Tekstar for the right to place their equipment in a Tekstar central office or for their use of power in a Tekstar central office.  (*Id.* ¶¶ 64.L, M).

### 6.    Tekstar's Charges to Qwest

In general, an LEC charges an LDC "originating" switched access fees for calls that meet tariff requirements.  (*Id.* ¶ 36).  Another LEC will charge the LDC "terminating" switched access fees when it delivers long-distance calls to end-user customers on the end user's premises within the LEC's certificated local calling area.  (*Id.*).  Typically, switched access fees are less than one

cent per minute.  (*Id.* ¶¶ 37–38).  Tekstar charged Qwest and other LDCs under its tariffs for switched access fees at the rate of 4.3 cents per minute for interstate calls and 7 cents per minute for intrastate calls.  (*Id.* ¶¶ 3, 11, 36–38, 81).  These higher rates were based on Tekstar's status as a rural competitive LEC, "and the assumption that volumes of traffic to Tekstar would be very small[,] as they were historically prior to Tekstar's traffic pumping."[9]  (*Id.* ¶ 38).

When Qwest uses another LDC for Least-Cost Routing, Tekstar charges the LDC, and the LDC in turn charges Qwest.  (FAC ¶ 80.C).  Qwest would not have used Least-Cost Routing if Tekstar had not billed for switched access fees for the calls to Defendants because it would have been cheaper for Qwest to deliver the calls directly to Tekstar.  (*Id.* ¶ 83).  Because Tekstar and Defendants were aware of Qwest's Least-Cost Routing practices, Tekstar entered into preferential contracts with other LDCs so that these LDCs would pay Tekstar when Qwest disputed payments to Tekstar.  (*Id.* ¶ 84).  These preferential contracts should have also been offered to Qwest because Qwest and the other LDCs are in the same position.  (*Id.* ¶ 85).

Qwest alleges that Defendant FCSCs are not end users for the purposes of Tekstar's tariffs.  (*Id.* ¶ 3).  Therefore, any charges Tekstar billed under its tariffs to Qwest for calls delivered to Defendants were illegal.  (*Id.* ¶¶ 3, 14).  Qwest disputed Tekstar's charges for switched access charges associated with calls delivered to Defendants and other FCSCs by letter in April 2008.  (*Id.* ¶ 16); *see also* (Letter from Angela Phillips, Qwest, to Joan Meece, Tekstar (Apr. 23, 2008), "Phillips Letter," Ex. 5, Attached to FAC) [Doc. No. 120-2 at 90–92].[10]

---

[9]     Competitive LECs are "new entrants that are supposed to offer local services in competition with incumbent LECs[.]"  (FAC ¶ 33 n.4).  Incumbent LECs are "are the traditional providers of local exchange services in an area."  *Id.*

[10]     The page numbers refer to the pages numbers assigned by CM/ECF to Document Number 120-2, which is a 265-page PDF of all exhibits submitted with the First Amended Complaint.

Tekstar and Defendants' relationships were designed to "dramatically increase" the volume of calls delivered to Defendants' phone numbers and secure LDCs' subsidization by charging the LDCs for "unjustified switched access charges." (FAC ¶ 79). Qwest attributes increased traffic volume from 2005 to 2008 to calls routed from Tekstar to phone numbers assigned to Defendants and other FCSCs. (*Id.* ¶ 13). "Tekstar knowingly, intentionally, and willingly agreed with Defendants to create this traffic pumping scheme and to participate in the conduct" alleged. (*Id.* ¶ 78).

As a result of Tekstar's agreements with Defendants, Qwest alleges it suffered millions of dollars of damages. (*Id.* ¶ 18). The preceding alleged facts form the basis for the following claims against all Defendants: tortious interference with contract (intrastate and interstate access tariffs), unfair competition, fraudulent concealment, tortious interference with contract (Least-Cost Routing contracts), and unjust enrichment. (*Id.* ¶¶ 86–110, 126–164). Qwest also alleges a separate count of unfair competition against Audiocom and Ripple for their provision of adult content in violation of federal statutes. (*Id.* ¶¶ 111–25).

## B. Procedural History

Qwest filed a complaint with the MPUC (the "MPUC Complaint") against Tekstar in 2009. (*Id.* ¶ 20). While the MPUC Complaint was pending, Qwest initiated this lawsuit against Tekstar, Audiocom, and Free Conferencing. *See* (Compl.) Tekstar filed an answer and counterclaims, and Audiocom and Free Conferencing moved to dismiss. (Mot. of Def. Audiocom, LLC to Dismiss Compl. Pursuant to Rule 12(b)(6) Fed. R. Civ. P.) [Doc. No. 24];

---

A court "may consider some materials that are part of the public record . . . as well as materials that are necessarily embraced by the pleadings[]" when considering Rule 12(b)(6) motion. *Miller v. Redwood Toxicology Labs., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (internal quotations and citations omitted). Thus, the Phillips Letter is properly considered in the determination of Defendants' 12(b)(6) Motions to Dismiss.

(Free Conferencing Corp.'s Mot. to Dismiss Qwest's Compl.) [Doc. No. 28]; (Tekstar Commc'ns, Inc.'s Answer & Countercls.) [Doc. No. 33]. Tekstar moved the Court for an order staying the case and referring some issues to the FCC. (Def. Tekstar Commc'ns, Inc.'s Mot. to Stay Proceedings & Refer the Core Issues to the Fed. Commc'ns Comm'n) [Doc. No. 47]. Qwest moved to dismiss some of Tekstar's counterclaims. (Qwest's Mot. to Dismiss Tekstar's Countercls. (Dkt. 33) II and III) [Doc. No. 57]. In July 2010, Chief Judge Davis stayed the case, referred some issues to the FCC, and dismissed the motions to dismiss without prejudice. (Mem. of Law & Order Dated July 12, 2010) [Doc. No. 80].

In October 2012, Qwest and Tekstar filed a joint motion to dismiss Tekstar from the instant case. (Joint Mot. to Voluntarily Dismiss Tekstar Commc'ns, Inc.) [Doc. No. 94]. Tekstar and Qwest advised the Court that they resolved their dispute before the FCC, which was consolidated with other disputes. (Mem. of Law in Supp. of Joint Mot. to Dismiss Tekstar Commc'ns, Inc., "Joint Tekstar Dismissal Mem.") [Doc. No. 96 at 3]. The FCC notified the parties that the Tekstar/Qwest referral did not have any issues pending before it and the FCC would not take any further action regarding Chief Judge Davis's referral. (*Id.*) Qwest and Tekstar asked Free Conferencing and Audiocom, the remaining defendants in the initial complaint, to sign a stipulation of dismissal. (*Id.* at 4). Free Conferencing did not oppose or consent to dismissing Tekstar. (*Id.*). Audiocom advised Tekstar's counsel by letter that it would only consent if certain conditions were met. (*Id.*). Qwest and Tekstar's memorandum addressed Audiocom's conditions, but Audiocom did not file a response to the motion. *See generally* (*id.*). Chief Judge Davis dismissed Tekstar, noting that the remaining defendants did not file oppositions to the motion. (Tekstar Dismissal Order at 1). At oral argument on the instant Motions to Dismiss, counsel for Qwest clarified that the terms of its settlement with Tekstar

releases only Tekstar and Qwest from their claims against each other; the settlement agreement does not limit Qwest's claims against Defendants.

By the parties' agreement and with the Court's permission, Qwest filed its First Amended Complaint in March 2013. (FAC). Free Conferencing and Audiocom filed Motions to Dismiss in April 2013. (Free Conferencing's Mot. to Dismiss); (Audiocom's Mot. to Dismiss). Vast/Basement Ventures, GCP, and Ripple filed their Motions to Dismiss in May. (Vast/Basement Ventures' Mot. to Dismiss); (GCP's Mot. to Dismiss); (Ripple's Mot. to Dismiss). The Motions to Dismiss were referred to the undersigned, and the Court held oral argument on all pending motions in June. (April 2013 Referral); (May 2013 Referral); (Minute Entry).

## II.     MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Qwest's alleged jurisdictional basis is diverse citizenship with an amount in controversy exceeding $75,000. (FAC ¶ 28); *see also* 28 U.S.C. § 1332(a). Audiocom and Ripple move this Court to dismiss the First Amended Complaint for lack of subject-matter jurisdiction because they allege the amount in controversy with respect them does not reach the $75,000 threshold. (Mem. in Supp. of Mot. to Dismiss of Def. Audiocom, LLC Pursuant to Rule 12(b)(6) Fed. R. Civ. P., "Audiocom's Mem. in Supp.") [Doc. No. 146 at 7–8]; (Mem. in Supp. of Mot. to Dismiss of Def. Ripple Commc'ns, Inc. Pursuant to Rule 12(b)(6) and 12(b)(1) Fed. R. Civ. P., "Ripple's Mem. in Supp.") [Doc. No. 178 at 8].

Specifically, Audiocom alleges the amount of Qwest's claims against it does not even reach $7,500. (Audiocom's Mem. in Supp. at 7); (Decl. of Ted Shpack in Supp. of Def. Audiocom LLC's Mot. to Dismiss the Am. Compl. of Qwest Commc'ns Pursuant to Rule 12(b)(6) and 12(b)(6) [sic] Fed. R. Civ. P., "Shpack Decl.") [Doc. No. 147 at 2]. Ripple alleges

the amount in controversy with respect to Qwest's claims against it is about $550. (Ripple's Mem. in Supp. at 8).

## A. Legal Standard

A federal court has jurisdiction over a case where the parties are citizens of different states and the amount in controversy, excluding interest and costs, is greater than $75,000. 28 U.S.C. § 1332(a). A facial attack challenging the court's subject-matter jurisdiction requires that a court review the complaint and defer to the non-moving party's factual allegations. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). But in a factual attack, the court may consider matters outside the pleadings, including affidavits. *Id.* (citation omitted). "[T]he non-moving party does not have the benefit of 12(b)(6) safeguards." *Bryan v. Dep't of Army*, 553 F. Supp. 2d 1098, 1101–02 (D. Minn. 2008) (MJD/AJB) (quoting *Osborn v. United States*, 918 F. 2d 724, 729 n.6 (8th Cir. 1990)).

As the proponent of federal jurisdiction, Qwest must establish this Court has jurisdiction by a preponderance of the evidence. *Kopp v. Kopp*, 280 F.3d 883, 884 (8th Cir. 2002) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 188–89 (1936)). Qwest meets this standard if it shows that "a fact finder could legally conclude, from the pleadings and proof adduced to the court before trial, that the damages that [Qwest] suffered are greater than $75,000." *Id.* at 885. If, however, "[a] defendant can establish to a legal certainty that the claim is for less that the jurisdictional minimum[,]" the complaint will be dismissed. *Bell v. Hersey*, 557 F.3d 953, 956 (8th Cir. 2009) (internal citation omitted).

## B. Analysis

In its First Amended Complaint, Qwest does not allege that each Defendant is responsible for a specific amount of damages. *See* (FAC). Instead, it generally alleges Defendants caused

Qwest millions of dollars in damages and the amount in controversy exceeds $75,000. (FAC ¶¶ 18, 28). Both Audiocom and Ripple challenge the fact that the amount in controversy is more than $75,000 and submit sworn statements to that effect. (Audiocom's Mem. in Supp. 7–8); (Shpack Decl. at 2); (Ripple's Mem. in Supp. at 8); (Aff. of Dixi L. Dougherty in Supp. of Mot. to Dismiss of Def. Ripple Commc'ns, Inc. Pursuant to Rule 12(b)(6) and 12(b)(1) Fed. R. Civ. P. ("Dougherty Affidavit") [Doc. No. 179 ¶ 8]. Because their attack is factual, consideration of the parties' sworn statements is appropriate at this stage. *See Titus*, 4 F.3d at 593.

Audiocom submitted the Shpack Declaration, which describes payments of marketing fees from Tekstar. (Shpack Decl. ¶ 3). Shpack testifies that Audiocom received less than $7,500 in marketing fee payments from Tekstar during the period March 1, 2004, to April 17, 2013.[11] (*Id.* ¶ 4). Similarly, Ripple submitted a declaration from its Director of Operations, Dixi L. Dougherty ("Dougherty"). (Dougherty Affidavit ¶ 2). Dougherty testifies that marketing fees from Tekstar and Arvig, Tekstar's parent company, from the period October 20, 2006, to May 7, 2013, were $550. (*Id.* ¶ 8).[12]

In response, Qwest submits the declaration of Derek Canfield ("Canfield"). *See* (Pl.'s Decl. of Derek A. Canfield in Supp. of Opp'n to Mot. to Dismiss for Lack of Subject-Matter Jurisdiction, "Canfield Declaration") [Doc. No. 206]. Canfield is an executive director of usage audit and analysis for a company called TEOCO Corporation. (*Id.* ¶ 1); (Qwest's Mem. of Law Opposing Mots. (Dkts. 144, 170, 176) to Dismiss for Lack of Subject-Matter Jurisdiction Under

___

[11]   The Shpack Declaration covers March 1, 2004, "to the present." (Shpack Decl. ¶ 4). It was signed on April 17, 2013. *See generally*, (*id.*).
[12]   Dougherty notes his understanding "that Arvig and Tekstar are the same, or related, companies." (Dougherty Aff. ¶ 9). Qwest asserts that Arvig is Tekstar's parent company. (FAC ¶ 22).
      Dougherty's estimation is based on the period "October 20, 2006 to the present[.]" (Dougherty Aff. ¶ 8). The affidavit was signed on May 7, 2013. (*Id.* at 2).

Fed. R. Civ. P. 12(b)(1), "Qwest's 12(b)(1) Mem. in Opp'n") [Doc. No. 205 at 5]. Canfield reviewed Qwest's Call Detail Records ("CDRs") for calls destined for each Defendant's phone numbers, as well as the other FCSCs. (Canfield Decl. ¶ 4). Canfield isolated calls associated with Tekstar and separated those calls by the paths they followed, which were one of the following three routes: "On Net" traffic, which originated with Qwest and was sent directly to Tekstar via an access tandem, Onvoy; "Wholesale" traffic, which originated with another LDC, then was delivered to Qwest, and then to Tekstar; and Least-Cost Routed traffic, where Qwest delivered the call to another LDC, who then delivered it to Tekstar. (*Id.* ¶ 8). Canfield analyzed On Net and Wholesale calls together because the costs to Qwest were the same. (*Id.*). Canfield then determined interstate and intrastate calls destined for each Defendant. (*Id.* ¶ 9). Canfield excluded On Net and Wholesale charges by Tekstar after June 2008 because Qwest began to dispute invoices at that point. (*Id.* ¶ 10). Based on these metrics, Canfield calculates that Qwest will seek $511,011.12 total damages from Audiocom, and $206,184.25 from Ripple. (*Id.* ¶¶ 11, 14).

Based on Canfield's Declaration, the Court concludes that Qwest has demonstrated that a fact finder could conclude that Audiocom and Ripple are individually liable to Qwest for damages greater than $75,000. *See Kopp*, 28 F.3d at 884. Canfield has personal knowledge of the facts on which he relies, and submitted a sworn statement and supporting evidence to the Court. *See generally* (Canfield Decl.). Therefore, Qwest has met the required standard of showing jurisdiction by a preponderance of evidence. In contrast, neither Audiocom nor Ripple has shown that it is legally certain that Qwest's claim is less than $75,000 against either of them. While both Defendants submit sworn statements claiming that damages do not reach the required

threshold, they have not established that it is legally certain that Qwest cannot establish damages larger than $75,000.[13] *See Bell*, 557 F.3d at 956.

Because Qwest meets its burden to establish, by a preponderance of the evidence, that the Court has subject-matter jurisdiction, the Court recommends that Audiocom and Ripple's Motions to Dismiss be denied to the extent they seek dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## III.    MOTION TO DISMISS UNDER RULE 12(b)(6)

All Defendants move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). (Free Conferencing Corp.'s Mem. in Supp. of Mot. to Dismiss First Am. Compl., "Free Conferencing's Mem. in Supp.") [Doc. No. 141]; (Audiocom's Mem. in Supp.); (Mem. of Law in Supp. of Mot. of Vast Commc'ns and Basement Ventures to Dismiss, "Vast/Basement Ventures' Mem. in Supp.") [Doc. No. 168]; (Ripple's Mem. in Supp.).

### A.    Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the complaint contains "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted)).  A court accepts the facts alleged in the complaint

---

[13]    Ripple also argues that Qwest cannot aggregate its claims against Defendants to reach the jurisdictional threshold.  (Ripple's Mem. in Supp. at 8).  Because the Court determines that Qwest has subject-matter jurisdiction without aggregating its claims against all Defendants, it does not reach this issue.

Qwest argues, almost in passing, that Defendants are jointly and severally liable. (Qwest's 12(b)(1) Mem. in Opp'n at 9 (citing Minn. Stat. § 604.02; *In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 359 (D. Minn. 1999) (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 185–86 (Minn. 1999)))).  Qwest makes no allegations that the provisions of the statute apply, nor does it allege in its First Amended Complaint that Defendants are jointly and severally liable.  Therefore, the Court does not consider this argument in support of jurisdiction.

as true, and grants "reasonable inferences in favor of the nonmoving party." *Lind v. Midland Funding, L.L.C.*, 688 F.3d 402, 405 (8th Cir. 2012) (citation omitted). Legal conclusions "must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Claims of fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b). Required details include the "time, place[,] and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby . . . ." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (internal citations and quotations omitted).

## B.    Analysis

Despite the fact that Defendants are in substantially similar positions in this case, Defendants each filed separate motions, memoranda, and replies. In an effort to clearly analyze the parties' arguments, the Court begins by addressing certain common arguments that permeate Defendants' briefs and impact the case as a whole. The Court then addresses each of Qwest's claims against Defendants and the parties' arguments.

### 1.    Common Arguments

#### a.    Lack of Damages

Both Ripple and Audiocom make overarching arguments regarding Qwest's insufficient pleading of damages. (Ripple's Mem. in Supp. at 16–21); (Audiocom LLC's Reply Brief in Supp. of Its Mot. to Dismiss Am. Compl., "Audiocom's Reply") [Doc. No. 227 at 2–3, 7].

Unlike a 12(b)(1) analysis, considering matters outside the pleadings for a 12(b)(6) analysis would convert the motion to dismiss into one for summary judgment. *Gibb v. Scott*, 958

F.2d 814, 816 (8th Cir. 1992) (citations omitted); Fed. R. Civ. P. 12(d). Therefore, the Court considers only the claims made in Qwest's First Amended Complaint when addressing Ripple and Audiocom's arguments.

### i.     Ripple's Damages Arguments

Ripple first argues Qwest's First Amended Complaint alleges Qwest did not pay all the charges for which Tekstar billed, and therefore Qwest has not articulated damages. (Ripple's Mem. in Supp. at 16–17 (citing FAC ¶¶ 12, 84, 101)); (Reply Mem. in Supp. of Mot. to Dismiss of Def. Ripple Commc'ns, Inc. Pursuant to Rule 12(b)(6) and 12(b)(1) Fed. R. Civ. P., "Ripple's Reply") [Doc. No. 231 at 3]. Qwest alleges Tekstar billed it directly for delivering calls to Defendants using two methods: In one method, Qwest alleges Tekstar billed it for calls Qwest delivered from its own customers to Tekstar, for final delivery to Defendants' phone numbers. (FAC ¶ 80.A). In the other method, Qwest alleges Tekstar billed it for calls Qwest received from other LDCs. (*Id.* ¶ 80.B). Qwest then delivered these calls to Tekstar for final delivery to Defendants' phone numbers. (*Id.*). Qwest did not begin disputing its bills with Tekstar until April 2008, but the time period of the conduct at issue is 2005 to 2010. (*Id.* ¶¶ 3, 16). Thus, construing all factual inferences in favor of Qwest, as the Court must at this stage, the First Amended Complaint alleges Qwest suffered damages based on direct payments to Tekstar, at minimum, from the period 2005 to 2008.

Qwest alleges its Least-Cost Routing method of delivery caused damages indirectly. (*Id.* ¶ 80.C). In this delivery sequence, Qwest chose to deliver its customers' calls, destined for Defendants' phone numbers, to other LDCs, who then delivered the calls to Tekstar for final delivery to Defendants' phone numbers. (*Id.*). Qwest alleges that its payments to the other LDCs included Tekstar's illegal charges. (*Id.*). These facts infer, and Qwest more pointedly

argues in its response, that Qwest overpaid these LDCs for these calls because the intermediary LDCs also were charged improperly under Tekstar's tariffs, and the LDCs passed the improper charges on to Qwest. (Qwest's Mem. of Law Opposing Mots. (Dkts. 139, 144, 166, 170, 176) to Dismiss Under Fed. R. Civ. P. 12(b)(6), "Qwest's 12(b)(6) Mem. in Opp'n") [Doc. No. 207 at 55].

Second, Ripple argues that Qwest's alleged damages are part of its normal operating costs. (Ripple's Mem. in Supp. at 17). Ripple argues that because Qwest received payment from its customers for calls and withheld payments to Tekstar, Qwest did not suffer damages. (*Id.* at 17–21). Ripple's factual allegations regarding payments from Qwest's customers and Qwest's internal billing structure are not factual matters pleaded in the First Amended Complaint, and are therefore not considered for the purposes of a 12(b)(6) analysis. Further, whether Qwest received payment from its customers is not material to whether Qwest alleges damages as a result of Defendants' actions at this early juncture. Qwest alleges that, because of Defendants' agreements with Tekstar, it was billed for charges under Tekstar's tariffs that were not proper, and that it paid LDCs for charges that included improper switched access charges under Tekstar's tariffs. (FAC ¶ 80). That Qwest withheld payment to Tekstar only affects direct payments to Tekstar after April 2008 (FAC ¶ 16); it does not affect payments Qwest alleges it made to the other LDCs.

Granting all reasonable inferences in favor of Qwest, the Court finds Qwest has alleged damages not only against Ripple, but against all Defendants.

### ii.    Audiocom's Damages Argument

Audiocom argues that Qwest does not have damages because Qwest's allegations concern its bills from Tekstar. (Audiocom's Reply at 2–3, 7). Because Qwest has settled its

claims with Tekstar, Audiocom argues those payments are no longer in dispute and therefore cannot be damages. (*Id.*). But Qwest could have settled with Tekstar for less than its full damages. Qwest brought the First Amended Complaint against Defendants *after* it settled with Tekstar and Tekstar was dismissed from the case, suggesting that Qwest has independent damages, or residual damages (i.e., not paid by Tekstar) against Defendants. Therefore, the Court finds that, regardless of Qwest's settlement with Tekstar, Qwest alleged it suffered damages.

### b. Blanket Pleading Against Defendants

At various places in their submissions to the Court, Free Conferencing and Ripple argue that Qwest makes blanket allegations against "Defendants" without identifying which Defendant took which action. (Free Conferencing Mem. in Supp. at 10 n.1); (Ripple's Mem. in Supp. at 4–6, 21); (Free Conferencing Corp.'s Reply in Supp. of Mot. to Dismiss First Am. Compl., "Free Conferencing's Reply") [Doc. No. 230 at 2–3].[14] Typically, "[a] complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) (MJD/JSM) (citation omitted).

All but one of Qwest's claims are asserted against all Defendants. (FAC ¶¶ 86–110, 126–164). The exception is Count III: Unjust Enrichment, which is brought against only Audiocom and Ripple. (FAC ¶¶ 111–25). Additionally, most of Qwest's factual allegations treat

---

[14] Both Free Conferencing and Ripple raise this issue in the context of Qwest's first claim for tortious interference with contracts. (Free Conferencing Mem. in Supp. at 10 n.1); (Free Conferencing's Reply at 2–3); (Ripple's Mem. in Supp. at 21). But because Ripple also raises it as an overarching concern, the Court addresses the issue before addressing the specific claims. *See* (Ripple's Mem. in Supp. at 4–6).

Defendants as a group, and do not separate conduct by a particular Defendant. *See, e.g.*, (FAC ¶¶ 3, 7, 8, 15, 17–20, 53–67, 69–72, 74–78, 82, 84). Qwest makes allegations against a group of FCSCs, which includes Defendants. (*Id.* ¶¶ 3, 7, 8, 10–11, 13–17, 39, 53–57, 64–66, 73, 78, 80–83).[15]

Case law dismissing claims made against "all defendants" focused on the fact that those defendants appeared to be responsible for discrete actions alleged in the complaint, but the complaint did not identify which defendant took which action. *See, e.g.*, *Tatone*, 857 F. Supp. 2d at 835 (dismissing fraud claims against unnamed agents for various misrepresentations without prejudice); *Tully v. Bank of Am., N.A.*, Civil No. 10-4734 (DWF/JSM), 2011 WL 1882665, at *6 (D. Minn. May 17, 2011) (dismissing plaintiffs' amended complaint alleging fourteen causes of actions that involved fourteen mortgage loans and nine defendants where claims were asserted against defendants generally but did not specify which claims were against which defendant); *Liggins v. Morris*, 749 F. Supp. 967, 970–71 (D. Minn. 1990) (dismissing claims under 42 U.S.C. § 1983 where all claims were pleaded by all plaintiffs against all defendants).

Here, Qwest specifically alleges that each Defendant except Vast had a contract with Tekstar or its parent company, and alleges when each contract began. (FAC ¶¶ 22–23, 25–26).[16] Qwest alleges facts related to all Defendants as the result of their respective contracts with Tekstar. *See, e.g.*, (*id.* ¶¶ 53 (stating that Tekstar had business relationships with Defendants), 75 (Defendants' primary source of revenue was based on "switched access revenues paid to Tekstar")). For the Court to require Qwest to plead each claim and fact separately with respect

---

[15] The Court excludes Qwest's allegations against "Defendants and other FCSCs" from this description. *See* (FAC ¶¶ 69–72).

[16] Qwest alleges that "Basement Ventures' contracts and traffic with Tekstar transitioned to Vast." (*Id.* ¶ 27).

to each Defendant would create a complaint that would be not only significantly longer, but also unwieldy. Logistics aside, such a pleading is not required. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claims showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests[.]" (internal citations and quotations omitted)). The Court finds that the facts and claims alleged in the First Amended Complaint are sufficient to put each Defendant on notice regarding the claims against it, as required by *Twombly*.

### 2.  Claims Against Defendants

Qwest alleges five claims against all Defendants: Count I: Tortious Interference with Contract (Intrastate and Interstate Access Tariffs); Count II: Unfair Competition; Count IV: Fraudulent Concealment; Count V: Tortious Interference with Contract (Least-Cost Routing Contracts); and Count VI: Unjust Enrichment. (FAC ¶¶ 86–110, 126–164). Qwest alleges Count III: Unfair Competition against Audiocom and Ripple. (*Id.* ¶¶ 111–25). The Court addresses each claim in the order pleaded in the First Amended Complaint.

### a.  Count I: Tortious Interference with Contract (Intrastate and Interstate Access Tariffs)

To establish a claim for tortious interference with contract, Qwest must allege "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *E-Shops Corp. v. U.S. Bank Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (internal quotation and citation omitted). Each element will be discussed separately.

### i. Existence of a Contract

Qwest alleges the contracts at issue in this claim are tariffs Tekstar filed with the MPUC and FCC. (FAC ¶ 87); *see also* (FAC ¶¶ 11, 18, 49, 51). Defendants do not dispute categorizing Tekstar's tariffs as contracts, and courts recognize the contractual elements of tariffs. *See, e.g.*, *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1171–72 (9th Cir. 2002) (stating the filed-rate doctrine prohibits courts from determining whether a tariff is reasonable, but a court may interpret the provisions of a tariff); *MCI Telecomms. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992) (describing federal tariffs as "the law, not mere contracts[]"). Therefore, Qwest sufficiently alleges that a contract existed.

### ii. Defendants' Knowledge of the Contract

Qwest alleges Defendants had actual or constructive knowledge of the tariffs based on the filed-rate doctrine. (FAC ¶ 88). Ripple argues that there is no allegation that it was aware of Tekstar's tariffs (in other words, the contracts) and their limitations. (Ripple's Mem. in Supp. at 21–23). In its response, Qwest relies on a United States Supreme Court case for the proposition that Defendants were on constructive notice of Tekstar's tariffs because the filed-rate doctrine charges Defendants with notice of the tariffs. (Qwest's 12(b)(6) Mem. in Opp'n at 25–26 (citing *Am. Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 222–23 (1998)).[17]

---

[17]     The quote Qwest relies on, that "[s]hippers and travelers are charged with notice[,]" is from *Louisville & Nashville R. Co. v. Maxwell,*, 237 U.S. 94, 97 (1915). In *Louisville*, the Court considered whether the defendant traveler, who purchased railway tickets for less than the published rate, owed money to the plaintiff railroad company. *Louisville*, 237 U.S. at 95–96. The rate was published under the interstate commerce act. *Id.* The Court noted the rate is "the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice, of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable." *Id.* at 97. The "notice" language quoted in Qwest's memorandum is cited in *Central Office* when the Court states that the filed-rate doctrine applies to the Communications Act, and uses the language from *Louisville* as a description of "the basic

In addition to constructive knowledge of Tekstar's tariffs, Qwest alleges that Tekstar paid Defendants, including Ripple, a portion of the switched access fees Tekstar collected from Qwest for delivering calls to Defendants. (FAC ¶¶ 11, 12). These fees were charged under Tekstar's tariffs. (*Id.* ¶¶ 11, 49, 51–52). Because Qwest alleges that Tekstar's payments to Defendants were contingent on Qwest paying switched access fees under Tekstar's tariffs, Qwest has adequately pleaded that Defendants knew of Tekstar's tariffs. *See* (*id.* ¶ 88). Construing all inferences in favor of Qwest, as is required at this stage of the proceedings, Qwest has sufficiently alleged that Defendants knew of Tekstar's tariffs.

### iii.     Intentional Procurement of the Contract's Breach

All Defendants argue that Qwest's allegation that Defendants benefited from Tekstar's collection of switched access fees from Qwest does not show that Defendants procured Tekstar's breach. (Free Conferencing's Mem. in Supp. at 10–11); (Audiocom Mem. in Supp. at 9–10); (Vast/Basement Ventures' Mem. in Supp. at 6); (Ripple's Mem. in Supp. at 22–23); *see also* (Audiocom's Reply at 7); (Reply Mem. of Law of Vast Commc'ns & Basement Ventures in Supp. of Mot. to Dismiss, "Vast/Basement Ventures' Reply") [Doc. No. 228 at 4–5].

As described above, Qwest's allegations focus on Defendants' contracts with Tekstar and a direct relationship in those contracts between fees Tekstar collected from Qwest under its tariffs and payments to Defendants. (FAC ¶¶ 11, 12, 49, 51–52). Qwest alleges it paid illegal switched access fees as a result of Defendants' "joint plan with Tekstar." (*Id.* ¶¶ 2–3, 11–12, 14, 53). Qwest alleges that Tekstar's contracts with Defendants purported to provide Defendants with local exchange services, but Tekstar did not provide those services under its local exchange

---

contours of the filed rate doctrine under the [Interstate Commerce Act]." *Central Office*, 524 U.S. at 222.

tariff, which implies a breach of the tariff. (*Id.* ¶ 54). Construing all facts in favor of the moving party leads to the conclusion that Qwest has pleaded adequately a procurement of the breach.

### iv. Justification

Free Conferencing argues that Qwest's allegation of interference is not actionable because it was justified by Free Conferencing's own interests and that Qwest does not plead facts showing that the primary purpose of Free Conferencing's contract with Tekstar was to harm Qwest. (Free Conferencing's Mem. in Supp. at 11–12). Justification of interference is "a factual determination of what is reasonable conduct under the circumstances." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (internal citations omitted); *see also Noble Sys. Corp. v. Alorica Central,* LLC, 543 F.3d 978, 982–83 (8th Cir. 2008) ("Ordinarily, the existence of justification is a question of fact that the defendant must prove." (citation omitted)). When a defendant "pursues its rights through legal means[,]" its actions are justified. *Prudential Ins. Co. of Am. v. Metrowide Group*, Civ. No. 08-6438 (JMR/SRN), 2009 WL 9110461, at *6 (D. Minn. July 16, 2009) (citation omitted). On a motion to dismiss, a court may consider defenses apparent from the complaint or "materials properly before it on a motion to dismiss . . . ." *Noble Sys. Corp.*, 543 F.3d at 983.

Here, no justification is apparent from the First Amended Complaint. Qwest alleges specific facts to demonstrate Defendants were not the type of end users that Tekstar's tariffs contemplated, and for those reasons, Qwest was charged improperly. (FAC ¶¶ 3, 41–43, 47–49, 52, 64, 67). The parties vehemently dispute whether the type of agreements Tekstar and Defendants had were legal under the FCC. (Free Conferencing's Mem. in Supp. at 6); (Audiocom's Mem. in Supp. at 6); (Ripple's Mem. in Supp. at 10–16); (Qwest's 12(b)(6) Mem. in Opp'n at 17–25); (Ripple's Reply at 1–3). But the issue here is whether Defendants

interference with Tekstar's tariffs was justified. Resolving all factual disputes in favor of Qwest, the Court finds that Qwest has not alleged any justification for Defendants' interference with Tekstar's tariffs. *See Telluride Asset Mgmt. LLC v. Bridgewater Assocs., Inc.*, No. Civ. 04-4862 (JMR/FLN), 2005 WL 1719204, at *3 (D. Minn. July 11, 2005) (stating that the fact that the defendant's actions were justified was not sufficient to dismiss a tortious interference of contract claim because the defendant has the burden to prove "justification, a question of fact, at trial.") (citing *Midwest Great Dane Trailers, Inc. v. Great Date Ltd. P'ship*, 977 F. Supp. 1386 (D. Minn. 1997) (DDA)).

### v.     Damages

Finally, Free Conferencing and Ripple argue that Qwest does not allege actual damages. (Free Conferencing's Mem. at 12–14); (Ripple's Mem. in Supp. at 23, 24). Free Conferencing says Qwest failed to plead damages against it because Arvig, Tekstar's parent company, did not enter into a contract with Free Conferencing until April 2008, the same time that Qwest stopped paying Tekstar for disputed charges. (Free Conferencing's Mem. in Supp. at 12 (citing FAC ¶¶ 16, 22; Phillips Letter)). But as described above, Qwest alleges that it paid other LDCs for calls delivered through Least-Cost Routing, which included charges from Tekstar improperly billed under its tariffs. (FAC ¶ 80.C). Free Conferencing argues that the Least-Cost Routing contracts are not part of Count I, but Qwest does, in fact, describe them in Count I. (FAC ¶ 93); (Free Conferencing's Reply at 2).

Ripple's argument is that Qwest seeks recovery for "part of its normal operating expense" which is not "actual damage. (Ripple's Mem. at 23). This argument is essentially the same as Ripple's argument about Qwest's lack of damages discussed previously, and the same reasoning applies here—Qwest has alleged damages. Therefore, construing the facts in Qwest's

favor, the Court finds Qwest has sufficiently alleged damages against Free Conferencing, Ripple, and all Defendants.

### vi.        Recommendation

Based on the foregoing and construing all inferences in favor of Qwest as the moving party, Qwest has stated a claim for tortious interference with contract under Count I.  The Court recommends Defendants' Motions to Dismiss be denied with respect this claim.

### b.        Counts II and III: Unfair Competition Claims

Qwest makes two unfair competition claims.  *See* (FAC ¶¶ 97–125).  First, Qwest alleges that all Defendants unfairly competed against Qwest because they "deliberately caused (or induced, encouraged or assisted) Tekstar to violate several federal and Minnesota regulatory statutes, and to abuse its regulatory status as a [competitive ]LEC with filed access tariffs."[18] (FAC ¶ 98).  Second, Qwest alleges that Audiocom and Ripple are liable for unfair competition because "their businesses are expressly premised on encouraging and causing Tekstar to violate the requirements of 47 U.S.C. § 201(b)[,] which prohibits unjust and unreasonable practices, by violation of 47 U.S.C. § 223's prohibition of making indecent communications available to children without taking action to restrict access."  (FAC ¶ 112).

"Unfair competition is not a stand-alone tort with specific elements."  *Cenevo Corp. v. Southern Graphic Systems, Inc.*, 784 F. Supp. 2d 1130, 1142 (D. Minn. 2011) (JRT/AJB).  Instead, it is a tort that is dependent on either tortious interference with contract or improper use of a trade secret.  *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 832 (8th Cir. 1996).  A plaintiff must identify the underlying tort, and if the underlying factual bases are the same as the other

---

[18]        A competitive LEC is a new market entrant.  *See* (FAC ¶ 33 n.4).

claims, "the unfair competition claim is duplicative of the independent claims and must be dismissed." *Cenevo Corp.*, 784 F. Supp. 2d at 1142.

### i. Count II: Unfair Competition Claim Against All Defendants

Qwest alleges that all Defendants engaged in unfair competition by causing Tekstar to violate statutes and abuse its regulatory status, and because consumers may have been confused about Defendants free services that were subsidized by Qwest. (FAC ¶ 98, 108).

### (a) Underlying Tort

Most Defendants correctly argue that Qwest does not identify an underlying tort in support of its unfair competition claim. (Free Conferencing's Mem. in Supp. at 16–17); (Audiocom's Mem. in Supp. at 16–17); (Ripple's Mem. in Supp. at 25–26); (Audiocom's Reply at 8–10); (Free Conferencing's Reply at 4); *see also* (FAC ¶¶ 98–108). This alone is sufficient grounds to dismiss this claim. *See Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1034 (D. Minn. 2003) (RLE) (stating that the plaintiff "must identify the underlying tort which is the basis for the unfair competition claim[]" and granting summary judgment to defendant on plaintiff's unjust enrichment claim for that reason).

Qwest responds that "Minnesota's general category of torts which courts recognize for the protection of commercial interests includes at least violations of federal or state statutes or common law violations that . . . harm commercial interests." (Qwest's 12(b)(6) Mem. in Opp'n at 28) (internal quotations omitted). In support, Qwest refers to the Restatement (3d) of Unfair Competition (the "Restatement"), and a case from this District. (*Id.* at 27–28 (citing Restatement (3d) of Unfair Competition § 1; *Cimline, Inc. v. Crafco, Inc.*, 672 F. Supp. 2d 916, 931 (D. Minn. 2009) (RHK/JSM), *vacated in part and reversed in part on other grounds*, 413 F. App'x 240

(Fed. Cir. 2011))).[19]  One way a person "who causes harm to the commercial relations of another by engaging in a business or trade" may be liable is if "the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement."  Rest. (3d) Unfair Competition § 1(b).  *Cimline*, however, only states that the unfair competition and antitrust claims were "closely related" because both alleged inequitable conduct before the Patent and Trademark Office.  *Cimline*, 672 F. Supp. 2d at 931.

Qwest points to no Minnesota case law relying on section 1 of the Restatement to support the unfair competition claim asserted here.  *See* (Qwest's 12(b)(6) Mem. in Supp. at 27 (citing cases that cite the Restatement in support of unfair competition claims arising out of Missouri and Iowa law)).  When a state's highest court has not yet addressed an issue, this Court may predict how the state's highest court would resolve it.  *See Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1301 (8th Cir.1993) (considering substantive tort law of Arkansas and stating that "[b]ecause the Arkansas Supreme Court has not addressed the proper standard of proximate causation in asbestos-exposure cases, the district court's task was to predict how the Arkansas Supreme Court resolve the issue if confronted with it."  (internal citations omitted)).

Because the Court may "look to the reasoning of other courts for guidance[,]" the foreign cases cited by Qwest will be examined.  *Vennemann v. Badger Mut. Ins. Co.*, 334 F.3d 772, 773 (8th Cir. 2003) (considering various circuit courts of appeals' interpretation of "'vacancy' in the context of a homeowner's insurance policy . . .");  *see also* (Qwest's 12(b)(6) Mem. in Opp'n at 27 (citing foreign cases)).  Nonetheless, Qwest's foreign cases—where federal courts have

---

[19]      Qwest cites to the Westlaw citation for *Cimline*, but Westlaw shows this case was published in the Federal Supplement reporter.  (Qwest's 12(b)(6) Mem. in Supp. at 28–29).

considered the Restatement in light of unfair competition—do not address unfair competition claims similar to Qwest's. In one case, the Eighth Circuit found that Missouri recognizes the Restatement as authority. *C.B.C. Dist. & Marketing, Inc. v. Major League Baseball Advanced Media, LP*, 505 F.3d 818, 822–23 (8th Cir. 2007). But there, Missouri recognized the Restatement as authority in "this kind of case," which refers to right of publicity cases. *Id.* at 822 (citing *Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. 2003)). The Eastern District of Missouri interpreted *Doe* to give the Restatement authority for Missouri's unfair competition claims. *Hubbs Mach. & Mfg., Inc. v. Brunson Instrument Co.*, 635 F. Supp. 2d 1016, 1018 (E.D. Missouri 2009). But *Hubbs*, like the *C.B.C.* case, does not address statutory violations. *Id.* at 1018–19 (citing section 1 of the Restatement for harm to commercial relations). Finally, Qwest cites a federal case interpreting Iowa state law. (Qwest's 12(b)(6) Mem. in Supp. at 27 (citing *ProBatter Sports, LLC v. Joyner Techs., Inc.*, 2006 WL 140655, at *3 (N.D. Iowa Jan. 17, 2006))). In *ProBatter Sports*, the court refused to dismiss the unfair competition counterclaim and cited the Restatement for its comment that "[i]t is impossible to state a definitive test for determining which methods of competition will be deemed unfair." *ProBatter Sports*, 2006 WL 140655, at *3. The Iowa case does not address an unfair competition claim based on statutory violations, and therefore, like the Missouri cases, it does not support Qwest's position that this Court should recognize a tort based on statutory violations. The Court declines to predict that the Minnesota Supreme Court would permit unfair competition claims predicated on statutory violations.

### (b)     Duplicative Factual Bases

Ripple and Free Conferencing argue that Qwest's unfair competition claim is based on the same underlying factual bases as its other claims, therefore must be dismissed. (Free

Conferencing's Mem. in Supp. at 16–17); (Ripple's Mem. in Supp. at 25–26); (Free Conferencing's Reply at 4); *see also Cenevo Corp.*, 784 F. Supp. 2d at 1142. Qwest responds that the claim is based on Defendants' participation in Tekstar's abuse of monopoly power, Tekstar's violation of federal and Minnesota regulatory statutes, and customer confusion, and that its "other claims do not allege these theories." (Qwest's 12(b)(6) Mem. in Opp'n at 29).

Many of the factual allegations listed under this unfair competition claim relate to Tekstar's breach of its tariffs. *See* (FAC ¶¶ 100, 103, 105). Therefore, these allegations are duplicative of those related to Qwest's first tortious interference with contract claim (Count I). Additionally, Qwest's allegation that Defendants caused Tekstar to violate Section 202 of the Communications Act by making preferential agreements with other LDCs is duplicative of its tortious interference with contract claim listed as Count V.

Finally, to the extent Qwest's other factual allegations, such as Tekstar's monopoly power and Tekstar's remittance of tariffs in violation of the Communications Act, purport to support the unfair competition claim, Qwest has, as stated above, failed to identify an underlying tort. *See, e.g.*, (FAC ¶¶ 100, 104).

### (c) Customer Confusion

Qwest's unfair competition claim also rests on the assertion that Defendants' conduct would cause confusion to customers about whether Defendants' service was truly "free." (FAC ¶ 108). Audiocom and Vast/Basement Ventures argue there could be no confusion the part of customers because the customers did not make any payments to Defendants. (Audiocom's Mem. in Supp. at 16); (Vast/Basement Ventures' Mem. in Supp. at 11–12); (Audiocom's Reply at 8–10); (Vast/Basement Ventures' Reply at 11–13).

Qwest alleges no facts that state, must less lead to any such inference, that Defendants billed, charged, or otherwise asked customers to pay for Defendants' services.

#### (d)    Recommendation

Defendants make several additional arguments in support of dismissing this unfair competition claim.[20]  But because Qwest fails to identify an underlying tort in support of its unfair competition claim, it is not necessary for the Court to reach these issues to make its recommendation that Defendants' Motions to Dismiss be granted to the extent they seek dismissal of Count II: Unfair Competition.

### ii.    Count III: Unfair Competition Claim Against Audiocom and Ripple

Qwest alleges that Audiocom and Ripple engaged in unfair competition by procuring Tekstar's violation of the Communications Act, which prohibits unjust and unreasonable practices (47 U.S.C. § 201(b)) and prohibits "making indecent communications available to children without taking action to restrict access[]" (47 U.S.C. § 223).  (FAC ¶ 112).

Audiocom argues that this claim must be dismissed because Qwest attempts to hold Audiocom liable for Tekstar's statutory violations and because Qwest does not allege an underlying tort.  (Audiocom's Mem. in Supp. at 16); (Audiocom's Reply at 9–11).  Ripple argues that Qwest alleges no underlying tort, does not allege harm, and that there is no private

---

[20]    Audiocom argues Qwest's unfair competition claim attempts to hold it liable for Tekstar's violations.  (Audiocom's Mem. in Supp. at 16); (Audiocom's Reply at 8–10). Audiocom also argues that this claim cannot be maintained because Qwest does not allege that Audiocom and Qwest compete.  (Audiocom's Reply at 8).  Ripple and Free Conferencing argue Qwest does not allege damages.  (Free Conferencing's Mem. in Supp. at 16–17); (Ripple's Mem. in Supp. at 25–26); (Free Conferencing's Reply at 2).  Vast/Basement Ventures argue that Qwest has not alleged competitive harm and Vast/Basement Ventures are not subject to the telecommunications statutes and rules with which Qwest and Tekstar must comply. (Vast/Basement Ventures' Mem. in Supp. at 11–12); (Vast/Basement Ventures' Reply at 11–13).

cause of action for violating § 223. (Ripple's Mem. in Supp. 26–27). Qwest's response is that it is not asserting a private right of action; instead, based on the Restatement, it is bringing a common law claim. (Qwest's 12(b)(6) Mem. in Supp. at 32).

In making this unfair competition claim, Qwest does not identify an underlying tort. *See* (FAC ¶¶ 111–25). Because Minnesota law does not permit an unjust enrichment claim to succeed without an identified, underlying tort, because Qwest's argument regarding the Restatement is not supported by Minnesota law, and for the reasons stated in connection with its recommendation to dismiss Count II: Unfair Competition, the Court likewise recommends dismissal of this claim.

### c.    Count IV: Fraudulent Concealment

To make a claim for fraudulent concealment, Qwest must allege that Defendants deliberately concealed a material fact or were silent "in the face of a duty to speak," that Defendants had knowledge, that Defendants intended for Qwest to rely on the concealment, causation, and damages. *In re Temporomandibular Joint (TMJ) Implants Prods. Liability Litig.*, 113 F.3d 1484, 1497 (8th Cir. 1997). Qwest must plead with particularity and specifically allege the underlying material facts. *Trustees of Twin City Bricklayers Fringe Ben. Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324, 331 (8th Cir. 2006).

Qwest's fraudulent concealment claim rests on two factual bases.    (FAC ¶¶ 126–52). First, Qwest claims Defendants knew of Tekstar's tariffs and fraudulently concealed that they were not end users, "did not have end user premises, did not subscribe to [a] local exchange service, and for many of the Defendants until some point in 2009, that their calls did not even go to a [local calling area]." (*Id.* ¶ 127); *see also* (*id.* ¶¶ 128–40). Second, Qwest alleges that Defendants and Tekstar knew of Qwest's Least-Cost Routing principles, and therefore Tekstar

entered into preferential contracts with other LDCs so that Qwest would route calls through the other LDCs and be forced to pay Tekstar for switches access charges that Tekstar was not entitled to charge under its tariffs.  (FAC ¶¶ 142–51).

All Defendants argue that they did not have a duty to disclose to Qwest.  (Free Conferencing Mem. in Supp. at 17–22); (Audiocom's Mem. in Supp. at 17–18); (Vast/Basement Ventures' Mem. in Supp. at 13–15); (Ripple's Mem. in Supp. at 29); (Vast/Basement Ventures' Reply at 13–15).  Qwest responds that no duty is required where, as here, it alleges deliberate concealment.  (Qwest's 12(b)(6) Mem. in Supp. at 32–38).  In the alternative, Qwest argues Defendants had a duty to speak due to their special knowledge.  (*Id.*)

### i.  Fraudulent Concealment With Respect to Tekstar Breaching Its Tariffs

#### (a)  Deliberate Concealment

Qwest alleges Defendants deliberately concealed the terms of their contracts with Tekstar and therefore no duty is required.  *See* (Qwest's 12(b)(6) Mem. in Supp. at 32–38).  A fraudulent concealment cause of action may stand when the plaintiff has alleged that it was "directly harmed as a result of the defendant's deliberate concealment of material facts."  *Twin City Bricklayers*, 450 F.3d at 331 (citation omitted).  Cases that have considered this basis for fraudulent concealment involved parties who had some type of relationship with each other.  *See, e.g.*, *id.* at 331 (determining that the third-party plaintiff, an employer, did not adequately plead fraudulent concealment because the employer did not allege that the third-party defendant, the union, concealed any specific fact); *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*, Civ. No. 10-3881 (RHK/LIB), 2013 WL 3989669, --- F. Supp. 2d ---, at *12 (D. Minn. Aug. 2, 2013) (plaintiff manufacturer failed to allege that defendant supplier "deliberately concealed any specific fact . . .").

Here, Defendants and Qwest have no direct relationship. Qwest essentially argues that Defendants concealed the details of their contracts with Tekstar because the contracts were confidential and not public. (FAC ¶¶ 15, 64, 69, 130). Qwest alleges that this "prevented Qwest from discovering the true nature of the relationships and from learning of the existence of the Defendants' traffic pumping scheme." (*Id.* ¶ 15). But Qwest does not allege any facts that show that Defendants' contracts with Tekstar were required to be accessible to the public or to Qwest. Nor does Qwest allege that Defendants may not enter into confidential contracts, or that Qwest has any right to view Defendants' contracts or any contracts that Tekstar enters into based on its tariffs.

Therefore, Qwest has failed to plead with particularity that Defendants deliberately concealed any material facts from Qwest.

### (b)    Duty Based on Special Knowledge

Qwest argues, as an alternative to the deliberate concealment element, Defendants had a duty to Qwest to disclose that Tekstar's tariffs did not apply to calls to Defendants' phone numbers based on their special knowledge (unknown to Qwest) that Tekstar was breaching its tariffs, and that this duty extended to Defendants as a third parties to the relationship between Qwest and Tekstar. (Qwest's 12(b)(6) Mem. in Supp. at 34–37). A duty may exist for a third party to disclose its "special knowledge of material facts to which the other party does not have access . . . ." *L&H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn. 1989). Minnesota courts have addressed this theory infrequently. *Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1065 (D. Minn. 2001) (JRT/FLN). Other courts apply this rule only when "1) parties enter into a contract or other transaction with each other; 2) one party has superior knowledge not readily available to the other; and 3) the party with superior knowledge is aware,

but does not point out, that the other is acting in reliance on an erroneous belief with respect to facts relating to the transaction." *In re TMJ*, 880 F. Supp. at 1317–18 (citing *Lorenz v. CSX Corp.*, 1 F.3d 1046, 1417 n.7 (3d Cir. 1993); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)).[21] But again, those cases involve a relationship that is absent here between Qwest and Defendants.

Qwest does not allege that it had any contractual relationship with respect to Defendants. Instead, Qwest discusses several examples in favor of the proposition that a defendant may have had a special duty based on its knowledge even when it is not a party to the contract that is the subject of the alleged fraud. (Qwest's Mem. in Opp'n at 35–37). In Qwest's first example, the Minnesota Supreme Court found the statements of an officer of a company were fraudulent when he misrepresented the financial status of his coal-purchasing company to a mercantile agency, which then made statements to the plaintiff regarding the financial status of the company. *Penn Anthracite Mining Co. v. Clarkson Securities Co.*, 287 N.W. 15, 17 (Minn. 1939). As an initial matter, the claim in that case was fraudulent misrepresentation, not fraudulent concealment. *Id.* at 17. Second, the case does not address "special knowledge." Finally, the coal-purchasing company, who did have a contract with plaintiff, assigned some or all of its accounts receivable to the defendant company. *Id.* at 16, 17. Thus, while the plaintiff and defendant did not have a direct contract, they had a relationship *like* a contract because defendant was the appropriate

---

[21] Although this case cites law outside of this District and Circuit, its summary judgment award was affirmed by the Eighth Circuit, and its elements of "special knowledge" have since been cited and applied by the Minnesota Court of Appeals in an unpublished decision. *See In re TMJ*, 113 F.3d 1481, 1497 (8th Cir. 1997); *Rossbach v. FBS Mortg. Corp.*, Nos. C3-97-1522, C9-97-1852, 1998 WL 156303, at *6 (Minn. Ct. App. Apr. 7, 1998). The Court therefore finds its reasoning persuasive.

target for plaintiff's suit after the assignment of the accounts receivable. Here, Qwest has no relationship similar to a contract to any Defendant.

In a second example, the Minnesota Supreme Court found a bank had a duty to disclose to a borrower that one of the bank's depositors was insolvent, and the bank was therefore found liable for fraudulent concealment. *Richfield Bank & Trust v. Sjorgre*, 244 N.W.2d 648, 650 (Minn. 1976). The bank's duty was grounded not only in special circumstances, but also because "'[t]here is a moral duty of banks to the community in which they do business to use reasonable care in seeing that their depositors are not committing a fraud upon the public.'" *Id.* at 651 (quoting *Cunningham v. Merchs.' Nat'l Bank of Manchester, N.H.*, 4 F.2d 25, 29 (1st Cir. 1925)). There is no allegation here that Defendants have any such duty to the community.

Qwest's third example is inapposite to this case because it addresses a defendant's minimum contacts with Minnesota for the purposes of personal jurisdiction. *Kopperud v. Agers*, 312 N.W.2d 443, 444–45 (Minn. 1981). The alleged fraud in *Kopperud* involved a general counsel of a bankrupt defendant accused "of state and federal securities law and fraud[,]" and it is simply not analogous. *Id.* at 444. The other cases Qwest cites do not support its position because the people or entities that committed or were accused of fraud had direct relationships with plaintiffs. *See Taylor Inv. Corp. v.* Weil, 169 F. Supp. 2d 1046 (D. Minn. 2001) (JRT/FLN) (finding omissions by defendants, who had an arms-length business transaction with plaintiff, did not have special knowledge sufficient to sustain summary judgment); *Security State Bank of Howard Lake v. Dieltz*, 408 N.W.2d 186, 190–91 (Minn. Ct. App. 1987) (finding that the jury could have reasonably found that the defendant bookkeeper for an automobile dealership had a duty to disclose to the bank that he knew that a check written to the bank had been fraudulently obtained in a case between the bank and officers of the dealership); *Jacobs v. Farmland Mut. Ins.*

*Co.*, 352 N.W.2d 803, 806–07 (Minn. Ct. App. 1984) (affirming jury's determination that fraud committed by defendant insurance company and defendant agent against plaintiff insured where fraud was based on special knowledge), *reversed in part on other grounds*, 377 N.W.2d 441 (Minn. 1985).

Here, Defendants are merely contract partners of Tekstar. They do not have any relationship with Qwest, much less a relationship that would give to rise to a duty to disclose Tekstar's illegal conduct to Qwest, a party with whom they have no contractual relationship whatsoever. Based on the foregoing, the Court finds Qwest has failed to plead the first element of its fraudulent concealment claim; no sufficient particularity is pleaded either. Because this element is not satisfied, the Court finds Qwest has not stated a claim for relief that is plausible on its face and need not address Defendants' remaining arguments.[22] *See Zutz*, 601 F.3d at 848.

### ii. Fraudulent Concealment with Respect to Tekstar's LDC Contracts

Qwest also alleges Defendants are liable for fraudulent concealment based on the agreements Tekstar reached with other LDCs, which caused Qwest to use Least-Cost Routing to deliver calls through LDCs with preferential contracts with Tekstar. (FAC ¶¶ 142–51). Qwest fails to allege sufficient facts with respect to any duty Defendants may have had to speak to Qwest about these contracts or Defendants' deliberate concealment. Indeed, the only allegation about Defendants under this factual basis is Tekstar and Defendants concealed material facts regarding these contracts. (*Id.* ¶ 150). Qwest does not allege that Defendants had any role in Tekstar's contracts with the LDCs, much less deliberately concealed a material fact or failed in

---

[22] Ripple additionally argues that Qwest has not alleged any fraudulent act specific to Ripple and is not plead with the required particularity and that Qwest did not allege that Ripple had "special knowledge of material facts to which Qwest did not have access . . . ." (Ripple's Mem. in Supp. at 28–30).

their duties to speak about them. *See, e.g.*, (*Id.* ¶¶ 84–85). Qwest alleges only that Defendants knew of the Least-Cost Routing system and had Tekstar enter into preferential contracts. (*Id.* ¶ 84). Sufficient factual allegations, pleaded with particularity, do not support this conclusion.

### iii.   Recommendation Regarding Fraudulent Concealment Claims

Based on the foregoing, the Court recommends that Defendants' Motions to Dismiss be granted to the extent they seek dismissal of Claim IV: Fraudulent Concealment.

### d.   Count V: Tortious Interference with Contract (Least-Cost Routing Contracts)

Qwest alleges that Defendants tortiously interfered with Qwest's contracts with other LDCs in connection with Qwest's practice of using Least-Cost Routing to deliver calls to Defendants' phone numbers through other LDCs. (FAC ¶¶ 153–59). As noted above, to establish this claim, Qwest must allege "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *E-Shops Corp.*, 678 F.3d at 664 (internal quotation and citation omitted). The parties' dispute primarily focuses on the third element, breach: the majority of Defendants argue Qwest has not alleged a breach of these contracts and therefore cannot maintain this claim. (Free Conferencing's Mem. in Supp. at 23–24); (Audiocom's Mem. in Supp. at 9, 12–14); (Vast/Basement Ventures' Mem. in Supp. at 8–9); (Audiocom's Reply at 14–16); (Vast/Basement Ventures' Reply at 5–10); (Free Conferencing Reply's at 9–10). Qwest argues that a breach is not required by Minnesota law. *See* (Qwest's 12(b)(6) Mem. in Supp. at 41–45). At oral argument, Qwest conceded that if this Court finds that the *E-Shops* case, which requires a breach to sustain a tortious interference with contract claim, is controlling, its claim should be dismissed.

In the past, cases in this District have held that a breach is not required for a claim of tortious interference of contract under Minnesota law. *See e.g.*, *Northern PCS Servs., LLC v. Sprint Nextel Corp.*, Civ. No. 05-2744 (RHK/RLE), 2007 WL 951546, at *14 (D. Minn. Mar. 27, 2007) (stating that "it does not appear that [the plaintiff] must prove an actual breach of the [agreement] in order to establish its tortious-interference claim (citing *A&L Labs., Inc. v. Bou-Matic,* LLC, Civ. No. 02-4862 (PAM/RLE), 2003 WL 21005305, at *3 (D. Minn. Apr. 25, 2003)); *Metro Sports Facilities Comm'n v. Minn. Twins P'ship*, 638 N.W.2d 214 (Minn. Ct. App. 2002))); *Telluride Asset Mgmt. LLC*, 2005 WL 1719204, at *2 (stating that breach was not required and instead plaintiff could allege that that defendant "interfered with the contractual relations . . . by making the performance of [the] contract more burdensome or difficult, or by rendering its performance of less value to [the plaintiff]." Other cases have explicitly held that a breach is required. *See, e.g.*, *Klosek v. Am. Express Co.*, No. 08-cv-426 (JNE/JJG), 2008 WL 4057534 , at *16 (D. Minn. Aug. 26, 2008) ("The absence of a breach, therefore, is fatal to a claim for tortious interference with contract." (citing *Kjesbo v. Ricks*, 517 N.W.3d 585, 588 (Minn. 1994))); *Guy Carpenter & Co., Inc. v. John B. Collins & Assocs., Inc.*, Civ. No. 05-1623 (JRT/FLN), 2006 WL 2502232, at *7 (D. Minn. Aug. 29, 2006) (dismissing tortious interference with contract claim for lack of breach).

The United States Court of Appeals for the Eight Circuit recently considered whether a breach of contract is required to maintain a claim for tortious interference of contract. *E-Shops Corp.*, 678 F.3d at 664–65. Because federal courts are bound by the Minnesota Supreme Court's decisions on substantive issues of state law, the Eighth Circuit reviewed the state of Minnesota law. *E-Shops Corp.*, 678 F.3d at 664–65; *see also Integrity Floorcovering, Inc. v. Broan-Nutone,*

LLC, 52 F.3d 914, 917 (8th Cir. 2008). The Eighth Circuit held Minnesota courts have expressly stated procurement of a breach of contract is required. *E-Shops Corp.*, 678 F.3d at 665.

Because the Eighth Circuit's precedent established in *E-Shops* binds this Court, it finds that procurement of a breach is required to maintain a tortious interference of contract claim, and Qwest has failed to allege such a breach. The Court recommends that Defendants' Motions be granted to the extent they seek dismissal of Count V: Tortious Interference with Least-Cost Routing Contracts.[23]

### e.  Count VI: Unjust Enrichment

To make a claim for unjust enrichment, Qwest must allege that it conferred a benefit on Defendants, that Defendants appreciated and knowingly accepted the benefit, and that Defendants accepted and retained the benefit "'under such circumstances that it would be inequitable for him to retain it without paying for it.'" *E-Shops, Inc. v. U.S. Bank Nat'l Assn.*, 795 F. Supp. 2d 874, 879 (D. Minn. 2011) (DSD/JJK) (quoting *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007)). Under Minnesota law, the claimant must establish the benefit under an implied-in-law contract or quasi-contract. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012); *see also N. States Power St. Paul Credit Union v. CUMIS Ins. Soc., Inc.*, Civil Nos. 13-0385 (JRT/LIB), 13-0387 (JRT/LIB), 2013

---

[23]  Defendants make additional arguments that this claim should be dismissed: Audiocom argues that there is no causal relationship between it and Qwest, and that Qwest has not adequately alleged that Audiocom procured the alleged breach of contract. (Audiocom's Mem. in Supp. at 14); (Audiocom's Reply at 16–17). Ripple argues that Qwest does not allege that Ripple had knowledge of the Least-Cost Routing contracts, nor how that knowledge resulted in intentional interference with those contracts. (Ripple's Mem. in Supp. at 31). Vast/Basement Ventures and Free Conferencing and argue that Qwest does not adequately allege that Defendants were aware of Tekstar's agreements with the other LDCs. (Free Conferencing's Mem. in Supp. at 24–25); (Free Conferencing's Reply at 10); (Vast/Basement Ventures' Mem. in Supp. at 9); (Vast/Basement Ventures' Reply at 10–11). Because the Court finds the breach issue is dispositive, it does not reach these arguments.

WL 4052675, at *6 (D. Minn. Aug. 9, 2013) (quoting the same language in *Caldas*). The elements of establishing a quasi-contract are the same as the elements for unjust enrichment. *See Acton Const. Co. v. State*, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986). For a party to benefit unjustly, it could mean the party benefited illegally or unlawfully. *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 554 (8th Cir. 2008).

Even if a claimant successfully meets the elements of unjust enrichment, such a claim is not available where there is an adequate legal remedy. *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)).

Qwest alleges Defendants have "reaped substantial and unconscionable profits through Tekstar's tariffs[,]" Defendants have received money "to which they are not entitled[,]" and it would be unjust for Defendants to retain that money. (FAC ¶¶ 162–63).

### i. Qwest's Benefit to Defendants

Most Defendants argue Qwest did not confer a benefit directly on Defendants. (Free Conferencing's Mem. in Supp. at 21–29); (Audiocom's Mem. in Supp. at 20–21); (Vast/Basement Ventures' Mem. in Supp. at 16–17); (Vast/Basement Ventures' Reply at 15–16); (Free Conferencing's Reply at 11–12).

Qwest responds that the benefit does not need to be directly conferred and cites a Minnesota Court of Appeals case in support of this proposition. (Qwest's Mem. in Opp'n at 48–50 (citing *In re Estate of Neuman*, 819 N.W.2d 211, 216–17 (Minn. Ct. App. 2012))). In *Neuman*, the court of appeals affirmed the district court's order that estate beneficiaries prevailed on an unjust enrichment theory against a personal representative to who retained $5,000 from the estate after she had already been compensated for her services. *Neuman*, 819 N.W.2d at 216–17.

*Neuman* is not instructive to the instant case because the personal representative had a fiduciary duty to the estate. *Id.* at 217. This fiduciary duty required the personal representative to act "in the best interests of the estate." *Id.* Here, Defendants have no duty of any kind to Qwest, much less any obligation to act in anyone's best interests but their own.

Additionally, Qwest does not have any contractual or quasi-contractual relationship with Defendants. "[A] quasi-contract does not require a promise or privity between the parties." *Olson v. Synergistic Techs. Business Sys., Inc.*, 628 N.W.2d 142, 150 n.4 (Minn. 2001). But it does create "a legal obligation much like an actual contract." *Id.* The First Amended Complaint does not allege any promise or privity between the parties, nor does it not allege that Defendants have any legal obligation to Qwest.

Based on the foregoing, the Court finds Qwest has not sufficiently alleged that it conferred a benefit on Defendants.

### ii. Availability of Unjust Enrichment

The majority of Defendants argue Qwest had an adequate remedy at law in its claims against Tekstar, and therefore unjust enrichment is not an available remedy. (Free Conferencing's Mem. in Supp. at 28–29); (Vast/Basement Ventures' Mem. in Supp. at 16–17); (Ripple's Mem. in Supp. at 32); (Vast/Basement Ventures' Reply at 17–18); (Free Conferencing's Reply at 11–12). Qwest argues that unjust enrichment is available to it because the Minnesota cases discussing legal remedies consider statutory liens available to defendants, and Qwest does not have that particular remedy available to it. (Qwest's 12(b)(6) Mem. in Supp. at 54).

Cases finding the plaintiff had an adequate legal remedy typically consider a legal remedy against the defendant, not, as Defendants argue here, against a third party tort-feasor

(Tekstar). *See, e.g.*, *Service Master of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305–06 (Minn. 1996) (contractor had a legal remedy against insurance company under statutory and constitutional provisions for liens). But the purpose of prohibiting an equitable remedy when a legal remedy is available is to prevent the plaintiff from recovering twice, once in law and once in equity. *See Munshi v. J-I-T Servs., Inc.*, No. A06-346, 2007 WL 92852, at *3 (Minn. Ct. App. Jan. 16, 2007) (stating that "[t]o permit respondent to recover against appellant in quantum meruit and permit him to attempt to collect a judgment against IBCI could result in double recovery for respondent[]" where IBCI was an out-of-business company that had a default judgment in respondent's favor and for which appellant had taken over its service agreements).

Qwest had a legal remedy against Tekstar. It initially sued Tekstar under the Communications Act and then settled with Tekstar. (Compl. ¶¶ 94–127); (Joint Tekstar Dismissal Mem.). Qwest's allegations of unjust enrichment allege that it would be unjust to allow Defendants to retain the money they received from Tekstar when Tekstar charged Qwest under its tariffs—the allegedly illegal conduct for which Qwest initiated its complaint against Tekstar. (FAC ¶¶ 162–63). This is the same money Qwest sought in its Complaint against Tekstar. *See generally*, (Compl.). To permit Qwest to go after this same "pot" of money from Tekstar, both directly, through its settlement with Tekstar, and indirectly, from Defendants in the instant case, would permit a double recovery.

Qwest also argues that the legal remedy must be effective. (Qwest's 12(b)(6) Mem. in Supp. at 54 (citing *Ostrander v. Ostrander*, 252 N.W. 449, 450 (1934))). More recent case law states that the legal remedy must be *available* to prevent unjust enrichment; it does not require that Qwest took advantage of the legal remedy. *See, e.g.*, *Drobnak v. Andersen Corp.*, 561 F.3d 787, 787 (8th Cir. 2009) (affirming dismissal of unjust enrichment claims under Minnesota law

because plaintiffs "would have had an adequate legal remedy against [the defendant] if they had adhered to the statutory notice and Rule 9(b) pleading requirements[]"); *Southtown Plumbing, Inc.*, 493 N.W.2d at 140 (plaintiffs could not make a claim for unjust enrichment because they had a statutory remedy and chose not to enforce it). Therefore, regardless of the *result* of Qwest's legal remedy against Tekstar is, it was available to Qwest and an unjust enrichment claim cannot be maintained.

### iii. Recommendation Regarding Unjust Enrichment

Defendants make several arguments in addition to those addressed here.[24] Because the Court finds that Qwest has not alleged it conferred a benefit on Defendants and because the Court finds that Qwest had a legal remedy against Tekstar, the Court finds it is not necessary to reach the additional arguments for the purposes of disposing of the unjust enrichment claim.

The Court recommends that Defendants' Motions to Dismiss be granted to the extent they seek dismissal of Count VI: Unjust Enrichment.

## IV. CONCLUSION

Accordingly, based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Free Conferencing Corporation's Motion to Dismiss First Amended Complaint [Doc. No. 139] be **GRANTED in part** and **DENIED in part** as follows:

---

[24] Audiocom argues any fees Audiocom received from Tekstar were not unjust because Tekstar connected Qwest's customers with the number they dialed. (Audiocom's Mem. in Supp. at 20–21). Free Conferencing also argues that Qwest does not allege Free Conferencing made direct representations to Qwest regarding the Least-Cost Routing contracts. (Free Conferencing's Reply at 12). Ripple argues that Qwest's damages are minimal. (Ripple's Mem. in Supp. at 33).

a. To the extent the Motion seeks dismissal of Count I: Tortious Interference with Contracts (Intrastate and Interstate Access Tariffs), it is **DENIED**;

b. The Motion is **GRANTED** in all other respects, and the Court recommends dismissal of the following claims: Count II: Unfair Competition; Count IV: Fraudulent Concealment; Count V: Tortious Interference with Contract (Least-Cost Routing Contracts); and Count VI: Unjust Enrichment.

2. Defendant Audiocom LLC's Motion to Dismiss Amended Complaint [Doc. No. 144] be **GRANTED in part** and **DENIED in part** as follows:

a. To the extent the Motion seeks dismissal based on lack of subject-matter jurisdiction, it is **DENIED**;

b. To the extent the Motion seeks dismissal of Count I: Tortious Interference with Contracts (Intrastate and Interstate Access Tariffs), it is **DENIED**;

c. The Motion is **GRANTED** in all other respects, and the Court recommends dismissal of the following claims: Count II: Unfair Competition; Count III: Unfair Competition; Count IV: Fraudulent Concealment; Count V: Tortious Interference with Contract (Least-Cost Routing Contracts); and Count VI: Unjust Enrichment.

3. Defendants Vast Communications and Basement Ventures LLC's Motion to Dismiss [Doc. No. 166] be **GRANTED in part** and **DENIED in part** as follows:

a. To the extent the Motion seeks dismissal of Count I: Tortious Interference with Contracts (Intrastate and Interstate Access Tariffs), it is **DENIED**;

b.      The Motion is **GRANTED** in all other respects, and the Court recommends dismissal of the following claims: Count II: Unfair Competition; Count IV: Fraudulent Concealment; Count V: Tortious Interference with Contract (Least-Cost Routing Contracts); and Count VI: Unjust Enrichment.

4.      Defendant Ripple Communications, Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(6) and 12(b)(1) [Doc. No. 176] be **GRANTED in part** and **DENIED in part** as follows:

a.      To the extent the Motion seeks dismissal based on lack of subject-matter jurisdiction, it is **DENIED**;

b.      To the extent the Motion seeks dismissal of Count I: Tortious Interference with Contracts (Intrastate and Interstate Access Tariffs), it is **DENIED**;

c.      The Motion is **GRANTED** in all other respects, and the Court recommends dismissal of the following claims: Count II: Unfair Competition; Count III: Unfair Competition; Count IV: Fraudulent Concealment; Count V: Tortious Interference with Contract (Least-Cost Routing Contracts); and Count VI: Unjust Enrichment.


Dated: November 8, 2013

                                          _s/Steven E. Rau_____
                                          STEVEN E. RAU
                                          United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by      **November 22, 2013,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of

those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.