# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

QWEST COMMUNICATIONS COMPANY,
LLC, a Delaware Limited Liability
Company, d/b/a CenturyLink QCC,

        Plaintiff,

v.

FREE CONFERENCING CORP., <u>et al.</u>,

        Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 10-490 (MJD/SER)

---

Charles W. Steese, John T. Osgood, and Sandra L. Potter, Armstrong Teasdale LLP, and Jason D. Topp, CenturyLink, Counsel for Plaintiff.

Martin S. Chester and Rhyddid Watkins, Faegre Baker Daniels LLP, and Stephen Wald, Partridge Snow & Hahn LLP, Counsel for Defendant Free Conferencing Corp.

Larry D. Espel, Green Espel PLLP, Counsel for Defendant Audiocom, LLC.

Gregory R. Merz, Gray Plant Mooty, Mooty & Bennett, PA, Counsel for Defendants Basement Ventures, LLC and Vast Communications, LLC.

---

## I.  INTRODUCTION

    This matter is before the Court on Motions for Summary Judgment by

Defendants Audiocom, LLC, Basement Ventures, LLC and Vast

Communications, LLC [Docket No. 276] and Defendant Free Conferencing

Corporation [Docket No. 299].  The Court heard oral argument on February 6,

2015.  Because the record is replete with disputed fact issues, the Court denies

summary judgment.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      The Parties

Plaintiff Qwest Communications Company, LLC (d/b/a CenturyLink QCC)

("Qwest") provides telecommunications services nationwide.  It is also an

interexchange carrier ("IXC") (i.e. a long-distance telephone carrier).  Qwest

delivered long-distance calls to phone numbers assigned to Defendants using

Tekstar Communications, Inc. ("Tekstar").

Tekstar is a local exchange carrier ("LEC"), specifically a rural competitive

local exchange carrier ("CLEC"), which provides telecommunications to

approximately 11,000 customers in rural Minnesota.

Defendants Free Conferencing Corp. ("FC"), Audiocom, LLC

("Audiocom"), and Basement Ventures, LLC ("Basement") are conference calling

companies ("CCCs") who use Tekstar's services.  Because Qwest alleges that

Basement's contracts and traffic transitioned to Defendant Vast

Communications, LLC, those two entities will be referred to collectively as "Basement."

### 2.      Relationship between Qwest, Tekstar, and Defendants

Local calls originate and terminate within a designated local calling area, called an "exchange."  Long-distance calls are typically carried by an IXC, such as Qwest, from the originating "exchange" (<u>i.e.</u> local calling area) to the terminating exchange.

Tekstar provides interstate and intrastate switched access services to IXCs, such as Qwest.  Qwest's subscribers pay Qwest in order to use its long distance network to carry their calls from one local network to another within and between states.  LECs route the calls on the originating end over the LEC's local telephone network to the IXC, which then routes the call over the LEC's local telephone network to the recipient based on the telephone number dialed.  Sometimes, IXCs hand the call off to a wholesale provider of long distance services when it is less expensive for another carrier to complete the call.  LECs bill access charges to IXCs for the use of their local networks – both originating and terminating access charges.  The LECs have monopoly control over calls to numbers in their local calling area.

For the purposes of this case, calls made to Defendants were delivered in one of three ways:

(1)     A Qwest customer makes a call to Defendants, which Qwest delivers to Tekstar, the LEC, who delivers it to Defendants;

(2)     A customer of another IXC makes a call to Defendants, which the IXC passes to Qwest, who delivers the call to Tekstar, who delivers the call to Defendants;

(3)     A Qwest customer makes a call to Defendants, which Qwest delivers to another IXC, who delivers the call to Tekstar, who delivers it to Defendants.

The last method is known as Least-Cost Routing ("LCR"), because it is cheaper for Qwest to use another IXC as an intermediary than for Qwest to deliver the call to Tekstar itself.

Both Qwest and Tekstar are telecommunications companies, subject to regulation by the Federal Communications Commission ("FCC") and Minnesota Public Utilities Commission ("MPUC").  Tekstar has filed tariffs with the FCC and MPUC, which it used to charge Qwest.

The present dispute between the parties centers around Tekstar's practice of charging Qwest switched access charges on calls made to Defendants. Generally, the LEC at the origin of the call charges the IXC (Qwest) an originating switched access fee, and another LEC will charge a terminating

4

switched access fee for calls that meet the tariff requirements.  While those fees

are typically less than 1 cent per minute, Tekstar charged Qwest 4.3 cents per

minute for interstate calls and 7 cents per minute for intrastate calls, based on its

status as a rural competitive LEC and the assumption that the volume of traffic

would be very small.

Qwest generally asserts that traffic from Defendants did not meet the tariff

requirements for switched access charges.  For the tariff charges to apply, the call

must be delivered to the "end user" at the "end user's premises."  (See Tekstar

Interstate Tariff §§ 2.6 (Access Minutes), 3.6.4(C), 6.1.)  End users must

"subscribe[]" to an interstate telecommunications service from Tekstar's

interstate tariff.  (See id. § 2.6 (End User, Customer(s)).)  A "telecommunications

service" must be provided to the public at a fee.  47 U.S.C. § 153(53).

Furthermore, end users must purchase a local exchange service, which means

that the call uses a "common line."  (See id. §§ 2.6 (Common Line),

3.3.1, 4.3(A), (B)(1).)  Qwest points to substantially similar provisions in Tekstar's

intrastate tariff.  (Tekstar Intrastate Tariff §§ 3, 5(I), 5(VIII)(D).)  (Because, as

relevant to this lawsuit, the tariffs' requirements are substantially identical, this

Order will refer to both the interstate and intrastate tariffs as the "tariff.")

Qwest claims that calls to Defendants did not meet Tekstar's tariff requirements.  Furthermore, Tekstar's relationship with Defendants was designed to increase the volume of calls delivered to Defendants' phone numbers (a practice known as "traffic pumping"), which was ultimately subsidized by the IXCs' payment of illegal switched access charges.  In turn, Defendants collected a portion of the switched access fees paid to Tekstar by Qwest.

Qwest also notes that when it used another IXC for LCR, Tekstar charged the IXC, who in turn charged Qwest.  Qwest asserts that if Tekstar had not billed switched access fees for calls to Defendants, it would have been cheaper for Qwest to deliver the calls directly to Tekstar.

### 3.     Prior FCC Rulings

The FCC has addressed whether free CCCs like Defendants constitute "end users" for the purposes of switched access charges in a number of cases, some involving the same parties.  In <u>In re Qwest Communications Corp. v. Farmers and Merchants Mutual Telephone Co.</u>, 22 FCC Rcd 17973 (2007) (<u>Farmers I</u>), the FCC concluded that CCCs like Defendants were "end users" under LEC Farmers' tariff, and thus, upheld the terminating access charges charged to Qwest.  The FCC's decision in <u>Farmers I</u> was based on the finding that the CCCs "subscribed to [the LEC's] interstate service . . . and were billed the

6

federal subscriber line charge."  <u>In re Qwest Commc'ns Corp. v. Farmers &</u>

<u>Merchants Mutual Telephone Co.</u>, 24 FCC Rcd. 14801, 14805 (2009) (<u>Farmers II</u>).

In 2009, the FCC reconsidered its <u>Farmers I</u> decision in light of evidence that

Farmers had "back-dated contracts and invoices to make it <u>appear</u> that the

conference calling companies had been purchasing tariffed services."  <u>Farmers II</u>,

at 14803-04.  This new evidence, the FCC concluded, demonstrated that the CCCs

were not end users under the switched access service tariff, and thus, that

Farmers was not entitled to charge Qwest switched access tariff rates.  <u>Id.</u> at

14813.  The FCC reasoned as follows:

> The tariff's definition of the term "customer" is critical to our
> analysis because a person or entity is not an "end user" unless the
> person or entity is also a "customer."  The tariff requires that to be a
> customer, the person or entity must subscribe to the services offered
> under the tariff.  In this case, the record demonstrates that the
> conference calling companies did not subscribe, nor did they seek to
> subscribe, to the services offered under the tariff.  To the contrary,
> the evidence demonstrates that the conference call companies and
> Farmers expressly structured their telecommunications service
> contracts **to avoid** strict adherence to the terms of Farmers' filed
> tariff.  Therefore, we conclude that these companies were neither
> "customers" nor "end users" within the meaning of the tariff.  Thus,
> Farmers was not entitled to charge Qwest switched access charges
> under the terms of Farmers' tariff.

<u>Id.</u> at 14805 (footnotes omitted).  The D.C. Circuit Court of Appeals upheld the

FCC's decision.  <u>Farmers & Merchants Mut. Tel. Co. of Wayland v. FCC</u>, 668 F.3d

714 (D.C. Cir. 2011) ("In sum, the Commission, upon considering factors within its expertise, could reasonably conclude that Farmers' relationships with the conference calling companies had been deliberately structured to fall outside the terms of Farmers' tariff and therefore reasonably reject such services as tariffed services.").

In a 2013 decision, In re Qwest Communications Co. v. Sancom, Inc., 28 FCC Rcd. 1982 (2013) ("Sancom"), the FCC concluded that Sancom, a CLEC, unlawfully charged Qwest switched access charges for calls to CCCs, including the present Defendant FC.  Id. at 1989 ("As in [Farmers II], we find that the Free Calling Companies were not 'end users' under Sancom's Tariff, because Sancom did not bill the Free Calling Companies for, and they did not pay for, switched access service.")

### 4.    Tekstar's Contracts with Defendants

Starting in 2005, Tekstar formed contractual relationships with several CCCs to deliver calls through conference bridges.  Tekstar had agreements with over twenty such companies.  Tekstar entered in Service Agreements with Audiocom and Basement in 2006 and with FC in April 2008.

Under these agreements, Tekstar agreed to provide the Defendants with telecommunications services without charge.  Tekstar agreed to pay a

8

"marketing fee" to the Defendants from revenue collected from IXCs (i.e. switched access charges).  The agreements provided that the services provided by Tekstar were subject to Tekstar's tariff, incorporated into the contracts by reference.

Tekstar retained the right to amend the agreements if there was a substantial change in the switched access rates charged by Tekstar or paid by IXCs.  The agreements were modified in 2009.

The parties highlight conflicting evidence regarding whether Defendants or Tekstar initiated the contractual relationships between Defendants and Tekstar.  At this stage, viewing the evidence submitted in the light most favorable to the nonmoving party, Qwest, there is both direct and circumstantial evidence that each Defendant initiated its contractual relationship with Tekstar and that each Defendant dictated the contract terms.  For example, there is evidence that one Defendant pioneered the free conference calling business model used by Tekstar, that another Defendant solicited the contractual relationship from Tekstar, and that the third Defendant's contract with Tekstar was substantially identical to previous contracts entered by that Defendant.  Qwest also presents evidence showing that Defendants did nothing to evaluate

9

the legality of the contracts with Tekstar, despite clear indications that they were not end users under Tekstar's tariff.

### 5.   Qwest's Dispute over Tekstar's Access Charges

In early 2008, Qwest identified what it believed was an unexplained increase in the amount of traffic being terminated by Tekstar.  In April 2008, Qwest disputed Tekstar's charges for CCC usage and stopped paying Tekstar's invoices for Defendants' traffic.

In mid-2008, after disputing Tekstar's invoices, Qwest decided to use LCR to route traffic to Tekstar through another IXC if it could save 50% or more by doing so rather than by carrying the call itself.  It used the "50 Percent Rule" until early 2010, after the <u>Farmers II</u> decision, when it stopped sending to and paying other IXCs for CCC calls to Tekstar.

### 6.   Tekstar's Settlements with Other IXCs

At various times, other long distance carriers began challenging Tekstar's charges for CCCs.  In response, Tekstar entered into below-tariff settlement agreements with certain IXCs other than Qwest.

Qwest has put forth evidence that Audiocom, Basement, and FC were consulted regarding settlements with some of the other IXCs.  At some point, Tekstar obtained pre-authorization from Defendants for such settlements.

**B.      Procedural History**

In February 2010, Qwest filed a Complaint against Tekstar, FC, and

Audiocom in this Court.  In July 2010, this Court stayed the case and referred

certain issues to the FCC.  In October 2012, Tekstar and Qwest informed the

Court that they had reached a confidential settlement agreement and, in January

2013, Tekstar was dismissed from the lawsuit.  The FCC declined to take any

further action with respect to the Court's referral.

In March 2013, Qwest filed a First Amended Complaint asserting claims

against FC, Audiocom, Global Conference Partners, Ripple Communications,

Inc., Basement Ventures, LLC, and Vast Communications, LLC.  Defendant

Global Conference Partners has since filed for bankruptcy.  In January 2014, the

Court granted in part and denied in part the remaining Defendants' motions to

dismiss.  Defendant Ripple Communications was dismissed in March 2014.

The only remaining claim before the Court is Count 1, Tortious

Interference with Contracts (Intrastate and Interstate Access Tariffs) against

Defendants FC, Audiocom, and Basement.  Defendants have now moved for

summary judgment on the remaining claim.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the nonmoving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of</u>

<u>Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.   Tortious Interference

Qwest alleges that Defendants were aware of Tekstar's tariff and

wrongfully and intentionally procured Tekstar's breach of that tariff by entering

into contracts with Tekstar premised on charging Qwest switched access charges

that were not lawfully applicable to those calls.  Qwest further alleges that

Defendants wrongfully and intentionally procured Tekstar's breach of its tariff

by knowingly benefitting from the below-tariff agreements between Tekstar and other IXCs.

"Under Minnesota law, a claim of tortious interference with contractual relations requires that [the plaintiff] show: '(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.'" E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 678 F.3d 659, 664 (8th Cir. 2012) (quoting Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982)).  Because Qwest has raised genuine disputes as to material facts for each element, summary judgment is inappropriate.

### 1.    Existence of a Contract

Qwest has submitted sufficient evidence of the existence of a contract.  In the context of this case, Tekstar's tariffs were contracts that governed the relationship between Qwest and Tekstar.  See Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006).  Breach of contract actions are appropriate when a party asserts that tariff charges were inappropriately billed or that the carrier breached its tariff terms.  See, e.g., Connect Insured Tel., Inc. v. Qwest Long Distance, Inc., No. 3:10-CV-1897-D, 2012 WL 2995063, at *6 n.18

(N.D. Tex. July 23, 2012); Hoffman v. N. States Power Co., 764 N.W.2d 34, 45-46

(Minn. 2009); All Am. Tel. Co. v. AT&T Corp., 26 FCC Rcd. 723, 727 (2011).

### 2.       Knowledge of the Contract

Qwest has submitted sufficient evidence that Defendants had knowledge

of the relevant contract.  Qwest need not prove that Defendants had actual

knowledge of the tariff.  "It is enough if the defendant had knowledge of facts

which, if followed by reasonable inquiry, would have led to complete disclosure

of the contractual relations and rights of the parties."  Kjesbo v. Ricks, 517

N.W.2d 585, 588 n.3 (Minn. 1994) (citation omitted).

Here, Defendants' contracts with Tekstar reference payments from the

IXCs, such as Qwest, charged from the tariff and incorporate the tariff by

reference.  There is ample evidence that Defendants knew they were getting paid

a portion of the IXCs' tariff payments to Tekstar by virtue of their agreements.

There is also clear evidence that Defendants were aware of Tekstar's below-tariff

agreements with other IXCs.

### 3.       Intentional Procurement of Breach

Defendants dispute whether Tekstar breached the tariff and whether that

breach was caused by Defendants.  The Court concludes that there are genuine

issues of material fact as to both prongs.

### a)   Breach

A claim for tortious interference with contractual relations under

Minnesota law requires intentional procurement of the contract's breach.

Minnesota law further defines a breach of contract to be a "material" or

"important" breach.  See, e.g., Gen. Mills Operations, LLC v. Five Star Custom

Foods, Ltd., 703 F.3d 1104, 1107 (8th Cir. 2013); Nutrisoya Foods Inc. v. Sunrich,

LLC, 641 F.3d 282, 288 (8th Cir. 2011); 4 Minn. Dist. Judges Ass'n, Minn. Prac. –

Jury Instruction Guides, Civil CIVJIG 20.45 (5th ed. 2006).

There is no Minnesota authority to support Defendants' proposed

requirement that the entire contract be severed or that the tortious interference

result in complete nonperformance of the contract.  In fact, case law is to the

contrary, permitting tortious interference claims when only one or several terms

of a larger, ongoing contract have been breached.  See, e.g., Cardiac Pacemakers,

Inc. v. Aspen II Holding Co., 413 F. Supp. 2d 1016, 1024 (D. Minn. 2006); N. PCS

Servs., LLC v. Sprint Nextel Corp., Civ. No. 05-2744 (RHK/RLE), 2007 WL

951546, at *14 (D. Minn. Mar. 27, 2007); State by Burlington N. R.R. Co. v. Big

Stone-Grant Indus. Dev. & Transp., L.L.C., 990 F. Supp. 731, 736-37 (D. Minn.

1997), aff'd 131 F.3d 144 (8th Cir. 1997).  Other jurisdictions that have, like

Minnesota, adopted Section 766 of the Restatement (Second) of Torts, similarly

hold that a breach of an ongoing contract is sufficient to support a tortious

interference claim, even though the contract is not completely terminated.  <u>See,</u>

<u>e.g.,</u> <u>Kenty v. Transamerica Premium Ins. Co.</u>, 650 N.E.2d 863, 866 (Ohio 1995).

Here, Qwest has raised a genuine issue of material fact as to the existence

of a material breach of the tariff.  First, Qwest has presented sufficient evidence

that Tekstar breached its tariff by billing switched access charges to Qwest on

Defendants' traffic although their traffic did not qualify under the tariff.

Specifically, for the tariff to apply, the call must be delivered to the "end user" at

the end user's premises in the terminating exchange.  End users must purchase

tariffed services from Tekstar.  Qwest has submitted evidence that Defendants

were not "end users" under the tariff.  There is evidence that Defendants

expected to pay nothing for Tekstar's services and, in fact, were not billed and

paid nothing for Tekstar's services.  <u>See</u> <u>Farmers II</u>, at 14805, 14812 (holding

CCCs were not end users when they did not subscribe to the services offered

under the LEC's tariff); <u>Sancom</u>, at 1989 (holding that CCCs were not "'end

users' under [the LEC's] Tariff, because [the LEC] did not bill the [CCCs] for, and

they did not pay for, switched access service [and] [m]oreover, in several other

respects, [the LEC] and the [CCCs] behaved in a manner inconsistent with a

tariffed carrier/customer relationship").

Second, Qwest has presented sufficient evidence that Tekstar breached its

tariff by agreeing to bill other IXCs below-tariff rates while charging Qwest tariff

rates for the same exact service, thus causing Qwest to pay for Defendants' calls

through LCR when Qwest should not have been required to pay for the calls at

all.  The tariff is Tekstar's public offer of the same rates, terms and conditions for

all IXCs.  See Cahnmann v. Sprint Corp., 133 F.3d 484, 487 (7th Cir. 1998) ("The

terms and conditions of service are set forth in 'tariffs,' which are essentially

offers to sell on specified terms, filed with the FCC and subject to modification or

disapproval by it.  Once a tariff is filed and until it is amended, modified,

superseded, or disapproved, the carrier may not deviate from its terms.").  The

FCC allows CLECs to enter into negotiated contracts with IXCs in certain

circumstances.  Viewing the evidence in the light most favorable to Qwest,

Tekstar breached the tariff by entering into below-tariff agreements with other

IXCs as part of a scheme to continue to illegally bill Qwest for Defendants' calls,

through the operation of LCR.  Qwest points to evidence that Defendants knew

that Tekstar was billing their calls to Qwest under the tariff but billing their calls

to certain other IXCs under lower cost commercial arrangements.  There is further support for the conclusion that Defendant knew that this meant that, even when Qwest legitimately refused to pay the tariffed rate to Tekstar for their calls, Qwest would still pay for their calls under LCR, although the correct charge would have been zero because Defendants were not end users.

### b)    Inducement

To prevail on the third element of a claim for intentional interference with contract, Qwest must provide evidence of some act on the part of Defendants that was the proximate cause of the breach.  See Royal Realty Co. v. Levin, 69 N.W.2d 667, 672 (Minn. 1955).  Here, the material facts surrounding Defendants' intentional procurement of Tekstar's purported breach are disputed, including whether Defendants were responsible for the business model and their involvement in Tekstar's negotiations with the IXCs.

Qwest has raised a genuine material fact dispute regarding whether Defendants induced Tekstar to breach its tariff by charging switched access charges to Qwest for Defendants' traffic.  For example, it points to evidence that Defendants actively pursued relationships with Tekstar and negotiated with Tekstar for secret agreements that provided free service and sharing of illegal access charges and were purposefully structured to avoid tariff requirements.

18

Defendants had previously entered into substantially identical contracts with other LECs before Tekstar.

Qwest has also raised a genuine material fact dispute regarding whether Defendants induced Tekstar to breach its tariff with Qwest through causing Tekstar to enter into below-tariff settlement agreements with other IXCs for Defendants' usage. Qwest has pointed to evidence that Tekstar provided Defendants with notice before entering into the preferential deals and asked for their approval for these agreements. There is further evidence that Defendants later provided Tekstar with advanced approval to negotiate preferred off-tariff contracts with any IXC that still had a dispute with Tekstar. There is support for Qwest's assertion that Defendants influenced and relied on the agreements as part of the overall plan to profit from illegally billing Qwest for their calls.

Defendants' claim that they believed their actions to be legal is not dispositive. See, e.g., Burlington N. R.R. Co., 990 F. Supp. at 737. In any event, given the evidence of Defendants' knowledge of Tekstar's tariff and communications with Tekstar and others regarding their business model, a reasonable factfinder could conclude that Defendants knew and intended that their actions and contracts with Tekstar would force Tekstar to breach its tariff.

Although Defendants were not the first CCCs to pursue their business

model with Tekstar, in this litigation Qwest only seeks liability and

compensation for the alleged breaches by Tekstar with relation to the minutes for

these Defendants' traffic.  Qwest's theory is that each bill from Tekstar for each

Defendant's minutes was a discrete breach of Tekstar's tariff.  The question of

whether Tekstar violated its tariff with other CCCs before contracting with

Defendants is not material to whether these Defendants induced Tekstar to

breach its tariff with Qwest with respect to calls to these particular Defendants.

### 4.    Justification

There is a fact question regarding whether Defendants were justified in

their interference.

> A party may justifiably interfere with another's contract if the
> alleged interferer has a legitimate interest, economic or otherwise, in
> the contract or expectancy sought to be protected and employs no
> improper means.  However, bad faith will be imputed when the
> alleged interferer has knowledge of the contract at issue.  And
> [i]nterference is unjustifiable when it is done for the indirect purpose
> of injuring the plaintiff or benefiting the defendant.  The question of
> justification is ordinarily one of fact, but where no reasonable juror
> could find the interference justified, the question may be decided as
> a matter of law.

St. Jude Med., S.C., Inc. v. Biosense Webster, Inc., 994 F. Supp. 2d 1033, 1049 (D.

Minn. 2014) (citations omitted).

Defendants were aware of Tekstar's tariff, yet there is evidence that they intentionally interfered with that tariff.  There is further evidence that Defendants had the direct purpose to harm Qwest by forcing it to pay inappropriate charges, to Defendants' direct benefit.  Viewing the evidence in the light most favorable to Qwest, Defendants cannot argue that they were entitled to rely on Farmers I or the allegedly unsettled state of the law before the FCC issued Farmers II.  The tariff language is clear that it only applies when there is an end user, that is, an entity that subscribes to Tekstar's tariffed services.  Qwest has also provided evidence that at two Defendants had clear warning that Farmers I was based on manufactured evidence.  Moreover, the FCC has noted that the law has been settled for 25 years that end users must pay a CLEC for its services. See Qwest Commc'ns Co., LLC v. N. Valley Commc'ns, LLC, 26 FCC Rcd. 8332, 8336-37 (2011), review denied by 717 F.3d 1017 (D.C. Cir. 2013).

### 5.    Damages

Finally, the Court holds that summary judgment is inappropriate on the question of damages.  Defendants argue that any damages suffered by Qwest relating to LCR stem from Qwest's own conduct, not that of Defendants.  After 2008, Qwest stopped paying access charges for traffic it routed to Tekstar.  However, it decided to implement the 50 Percent Rule, whereby Qwest diverted

Defendants' Tekstar traffic through other IXCs if the cost of doing so would be at least 50 percent less than the cost of Qwest carrying the call itself.  Qwest argues that, if Defendants had not induced Tekstar to bill Qwest for their calls, which were not subject to Tekstar's tariff, then the cost to Qwest of carrying such calls itself would have been zero.  Therefore, handing the call to another IXC under LCR would not have cost 50 percent less than carrying the call itself and Qwest would not have handed off any of Defendants' calls under the 50 Percent Rule.  Thus, the LCR charges were damages caused by Tekstar's breach of its tariff and flow directly from Defendants' tortious interference.

Defendants' reliance on primary assumption of risk is also unavailing. Primary assumption of the risk relieves a defendant of a duty which it might otherwise have owed to the plaintiff with respect to particular risks.  Daly v. McFarland, 812 N.W.2d 113, 119 (Minn. 2012).  First, primary assumption of the risk commonly applies to negligence actions regarding "participants and spectators of inherently dangerous sports" and "theories of recovery based on strict products liability theory and strict liability for abnormally dangerous activities."  Id. at 119-20, 120 n.1.  See also Springrose v. Willmore, 192 N.W.2d 826, 827 (Minn. 1971) ("Primary assumption of risk, express or implied, relates to

the initial issue of whether a defendant was negligent at all – that is, whether the

defendant had any duty to protect the plaintiff from a risk of harm.  It is not,

therefore, an affirmative defense.").  Qwest does not argue that Defendants were

negligent.  It has asserted an intentional tort, tortious interference, and

Defendants offer no support that primary assumption of the risk would be

applicable in such a case.  Second, Qwest has presented evidence that, given its

knowledge of Defendants' actions available to it at the time, it acted reasonably

in implementing the 50 Percent Rule to attempt to mitigate damages related to

Tekstar's CCC charges to Qwest under its tariff.  Qwest pursued the 50 Percent

Rule strategy until 2010, when it gained a fuller appreciation of the facts of this

case and it stopped LCR entirely for these Defendants.  Therefore, summary

judgment on the issue of damages is inappropriate.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1. Motion for Summary Judgment by Defendants Audiocom, LLC,
   Basement Ventures, LLC and Vast Communications, LLC
   [Docket No. 276] is **DENIED**.

2. Motion for Summary Judgment by Defendant Free Conferencing
   Corporation [Docket No. 299] is **DENIED**.

3. Qwest Communications Company, LLC's Motion to Cite
   Supplemental Authority Opposing Defendants' Motions for
   Summary Judgment [Docket No. 336] is **DENIED**.


Dated:   March 5, 2015                 s/ Michael J. Davis                          
                                       Michael J. Davis
                                       Chief Judge
                                       United States District Court